In re Charles E. MORRIS and Ruth E. Morris, f/d/b/a Sunbelt Properties and Morris Angus Farms, Debtors.

INTERFIRST BANK GREENVILLE, N.A., Plaintiff,

v.

Charles E. MORRIS and Ruth E. Morris, Defendants.

INTERFIRST BANK GREENVILLE, N.A. and Greg Gutman, Trustee, Plaintiffs,

v.

Charles E. MORRIS and Ruth E. Morris, Defendants.

Bankruptcy No. 385–30109 M–7.
Adv. Nos. 385–3337, 385–3338.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

March 5, 1986.

Lee A. Clark, Greenville, Tex., for plaintiffs.

Peter Gross and Robert A. Miller, Dallas, Tex., for debtors/defendants.

### MEMORANDUM OPINION ON COMPLAINTS TO DETERMINE DISCHARGEABILITY OF DEBT AND OBJECTING TO DISCHARGE

ROBERT C. McGUIRE, Bankruptcy Judge.

These adversary proceedings were consolidated for trial purposes and heard together on January 6, 1986. Following are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

### ADVERSARY NO. 385–3337

This particular adversary proceeding involved the Complaint of InterFirst Bank Greenville, N.A. ("InterFirst") to declare its debt non-dischargeable under 11 U.S.C. 523(a)(2)(B). As of May 31, 1985, InterFirst's unsecured debt was $23,621.16.

· InterFirst alleged that Debtor Charles E. Morris furnished financial statements to Plaintiff dated April 17, 1984 and February 3, 1983; that Plaintiff relied on accuracy of same; and that such financial statements were materially false and misleading in that:

(a) Debtor stated that he had furniture, household goods, and clothes of a value of $55,000, and on his Statement of Financial Affairs, he listed the items as having a value of $15,000.

(b) Debtor listed and claimed ownership of stocks and bonds of a value of $18,000, and now states that he did not own these stocks and bonds on that date.

(c) He listed debts secured by liens and real estate, other than homestead as being $110,000, whereas his debts on real estate, except his homestead, was approximately $313,000.

(d) He represented that his credit card liability was $250, when it was approximately $18,000.

(e) He listed no debt payable to Airline Pilots Association Credit Union, when his debt as shown on his Statement of Financial Affairs was over $9,000. (These alleged misrepresentations

had to do with the April 17, 1984 Financial Statement).

InterFirst alleged that the February 3, 1983 Financial Statement was false and misleading in that it listed debts to Ranger Properties of approximately $57,600, and the Statement of Financial Affairs filed herein listed debts of approximately $255,000 due Ranger Properties, and that the other prerequisites of § 523(a)(2)(B) were met also with respect to such 1983 financial statement.

### ADVERSARY NO. 385–3338

This Complaint objected to discharge under 11 U.S.C. § 727(a)(4) and (5). The suit was brought by InterFirst and the Trustee, although the amended complaint of InterFirst was basically the same complaint as outlined in Adversary No. 385–3337. The Trustee, in his amended complaint, alleged that Debtors made false oath or affirmation and/or account in connection with their bankruptcy in that they failed to disclose that they owned or otherwise had an ownership in and to property consisting of rights in a pension and retirement plan administered by Eastern Airlines, which plan is partially funded with Debtors' own funds, as well as stock and/or preferred stock of the Debtors purchased by them through Eastern's Employee Stock Ownership and wage reinvestment plan. The trustee also alleged that these properties were not disclosed in Debtors' answer to question 9 on the Debtors' Statement of Financial Affairs filed in the case. The Trustee further complains that Debtors valued their furniture and household goods at $55,000.00 on their InterFirst Financial Statement, but subsequently showed the property as valued at $15,000.00 on their schedules, without offering a satisfactory explanation as required by § 727(a)(5) of the Bankruptcy Code.

Debtors' bankruptcy petition was filed on January 22, 1985. Subsequently, they filed their Statement of Affairs and Schedules on or about February 6, 1985. These Schedules were amended on April 5, 1985, changing Item No. 9 of the Statement of Financial Affairs to read and reflect that Charles Morris was an Eastern Airlines pilot and member of the Air Line Pilots Association ("ALPA") union, and a beneficiary under three ERISA-qualified employee benefit plans established by contract between Eastern and ALPA, such plans being known as the Fixed Benefit Retirement Plan ("Plan A"), the Variable Benefit Retirement Plan ("Plan B"), and the Employee Stock Ownership Plan for Pilots ("Plan C"); that neither of the Debtors was a settlor or a trustee of any of the Plans; that the Plans contained valid spendthrift trusts under Texas law; that Debtors were not entitled to receive any proceeds or property from any of the Plans until Charles Morris' death, permanent disability or retirement. Debtors further alleged that their interest under each of the Plans was not property of the estate pursuant to § 541(c)(2) of the Bankruptcy Code, citing *In re Goff*, 706 F.2d 574 (5th Cir.1983).

The amendment goes on to state that, as of the date of filing of the petition on January 25, 1985, the value of Debtors' interest in and under each Plan was as follows:

(a) Plan A—$297,115.28

(b) Plan B—$192,166.35

(c) Plan C—$0.00

The amendment further amends Schedule B–2, Personal Property, pertaining to government and corporate bonds and other negotiable and non-negotiable instruments, to read:

As of January 25, 1985 . . ., Debtors had the option to receive outright 1,042.30 shares of Eastern Airlines Common Stock ($1.00) par value) and 260.575 shares of Eastern Airlines 20% Participating Non-Cumulative Convertible Preferred Stock . . . *The option was effective until January 31, 1985. Debtors did not exercise their option and, pursuant to the provisions of Plan C, on January 31, 1985, these shares automatically passed into an ERISA-qualified spendthrift trust created under the Employee Stock Ownership Plan For Pilots (Plan C).* [emphasis supplied]

As of January 25, 1985, the value of the 1,042.30 shares of Common Stock was $5,016.07 ... and the value of the 260.-575 shares of Preferred Stock was $1,485.28.

The Debtors further amended their Summary of Debts and Property at the same time.

It was undisputed that Debtors failed to list the ERISA-qualified pension and Plans A, B, and C upon the advice of their counsel. The attorney was of the opinion that the pension was not property of the estate, and therefore, the pension value and amounts did not have to be reflected in the original schedules. It is further undisputed that the Debtors did not discuss the Stock reflected in the Wage Reinvestment Plan with their attorney.

Debtor Charles Morris testified at the First Meeting of Creditors and did not voluntarily testify concerning the pension or Wage Reinvestment Plan upon direct examination by his counsel. However, on cross-examination by InterFirst, Mr. Morris readily admitted the information contained in the amended schedules. The First Meeting of Creditors was on or about February 19, 1985.

Mr. and Mrs. Morris had been married over twenty-five years. She left the decisions on the stock to her husband who substantially managed their business affairs. Mrs. Morris did not sign or participate in the preparation of the loan applications, or the bank financial statements. There was insufficient proof under either § 523 or § 727 as to any fraud regarding Mrs. Morris. Both adversary proceedings will be discussed in relationship to Mr. Morris.

Mr. Morris testified that he had been an Eastern Airline pilot for twenty years and that he received a statement each year for twenty years regarding the value of his pension. Mr. Morris contributed initially $3,800, which grew to over $8,500, with Eastern funding the remainder of the plan.

Trial testimony revealed that because of alleged financial problems plaguing Eastern Airlines in 1984, the company offered, as part of labor negotiations, a Wage Reinvestment Plan ("Wage Plan"). The Wage Plan apparently provided that it would be funded by Eastern funding, and the union agreeing to a reduction of wages in return for such funding. Mr. Morris testified that he did not list the Wage Plan on his Statement of Affairs filed February 6, 1985, because he thought he would receive a credit, rather than actually receiving stock from the Wage Plan. By means of a letter from Eastern in the middle of January, 1985, he became aware that, under the Wage Plan, he had an option to receive the stock outright, and that if he took no action by January 31, 1985, then the stock automatically passed into the trust. The Debtor alleged that his act of allowing the stock to be placed in trust and his subsequent silence on this subject were not attempts to insulate potential assets of the estate for his personal benefit. Nonetheless, the debtor was initially silent as to his decision to allow the stock, by his non-action, to be placed in a trust fund.

Mr. Morris further testified that the specific provisions of the Wage Plan were unclear because the proposed structure of the plan was continually being discussed for several years as part of the labor negotiations. He indicated that he was confused as to whether he owned actual stock because the labor negotiations created an atmosphere in which the specific ramifications of the Wage Plan were unclear.

The 1984 Wage Plan which was represented by Trustee's Ex. 9 comprised fourteen single-spaced printed pages, a twenty-three page prospectus, and eight exhibit pages, all single-spaced. In connection with these, two prospectus supplements dated December 21, 1984 and February 2, 1984 were also sent to the Debtor.

However, the debtor testified that on April 17, 1984, he signed a Financial Statement for InterFirst Bank ("InterFirst") in which he listed $18,000 in marketable securities, $12,000 as the value of a debenture in Eastern, and the remainder as the stock in question. On that Financial Statement,

he listed ownership of 3,000 Common and 3,000 Preferred shares of stock which he supposedly received from the Wage Plan.

Morris' attorney told him the pension plan did not have to be put on his schedules. However, Morris did not discuss the Wage Plan with his attorney prior to his testimony at the First Meeting of Creditors.

In 1984, Mr. Morris was paid approximately $120,000 by Eastern; in 1983, he received approximately $94,000; and in 1985, he was paid approximately $84,000. When he retires, he will receive approximately $54,000 per year from his pension.

The Trustee and Debtors entered into a stipulation whereby the Trustee would receive $8,500, i.e. the $3,600 that had accrued to approximately $8,500 in the pension plan.

The trustee argued that Mr. Morris' failure to list the Wage Plan stock and Debtor's decision to not exercise the option to get the stock prior to January 31, 1985 were transparent attempts at disguising otherwise easily liquidatable estate assets. The trustee further contended that debtors transferred, removed, or permitted to be removed from their estate such stocks or convertible stocks valued at approximately $6,500 within one year of the filing of their petition by allowing the stock option on January 31, 1985 to revert into a trust, which Debtors presumed would be immune to the claims of the Trustee. The Trustee further contended that the Debtors' actions caused undue expense to the trustee in attempting to recover the stock.

In the bank financial statement, a question was asked as to whether or not such stock was restricted, and the Debtor replied, "No".

The Ranger Properties debt was a substantial debt of the Debtors related to rental property. Allegedly, the Debtor believed that after he agreed to sell the Ranger properties, he eliminated his liabilities related to such venture. The sale of the Ranger Properties by the Debtor to Mounce involved a wrap-around note.

When Morris signed the Financial Statement in April, 1984, the deal with Mounce had not closed, but was imminent.

InterFirst specifically alleges that Debtors failed to disclose the entire Ranger Properties debt on which Debtors were liable. However, the Financial Statement also did not reveal all the assets connected with the Ranger Properties. On a prior financial statement with the bank, the assets represented by the Ranger rental properties, and which included the Ranger indebtedness, exceeded the value of the Ranger indebtedness.

On the Bank Financial Statement, Mr. Morris showed $250 as credit card liability, although the testimony showed that Debtors' credit card liability at the time substantially exceeded that amount. In April, 1984, Debtors owed in excess of $10,000 on charge accounts. Debtor testified that he misunderstood the financial statement inquiry about credit cards and thought it meant the monthly payment as opposed to the total amount.

The bank initially complained about a January 6, 1982 prior financial statement of the Debtor which reflected all the Ranger properties and indebtedness. However, in their amended complaint, they did not complain about this particular 1982 financial statement.

A reasonable inquiry by the bank concerning the discrepancies in the 1982, 1983, and 1984 financial statements regarding the Ranger indebtedness and properties would have revealed the inconsistencies, but the bank failed to make any reasonable inquiry.

The Debtor testified that he never discussed the Ranger property with anyone from the bank. The Debtor testified that he was told by a bank officer that the financial statements were a formality to fill out. Allegedly, he executed the February, 1983 financial statement without listing all of his assets because he was in a rush, and any omissions or misstatements were the result of carelessness, rather than an effort to conceal property. He further testified that the debenture was in his name

and he sold it. The sale of his rental properties through a wraparound note created his financial problems. In October, 1984, his purchaser had already defaulted on the wraparound note, and, thus, he knew he was beginning to be in default on the Ranger situation. He did not bring this to the attention of the bank. Allegedly, he was having discussions with Mounce, however, and felt he was going to be able to work out the problem.

As noted *infra*, the bank made no effort to check with independent sources regarding the Debtor's credit card liability, or his possible liabilities or assets. InterFirst placed primary reliance on Charles Morris' salary, his integrity, and their prior relationship with him, as opposed to the validity of each and every item listed as assets and liabilities on his 1983 and 1984 financial statements.

Plaintiffs have argued that Debtor's listing of his furniture, etc., at a value of $55,000 on a loan application, while listing the furniture as $15,000 on his schedules shows a willful intent to defraud creditors. While the difference is significant, the Debtors stated they listed furniture at the purchase value on a loan application, and listed it at liquidation value in schedules. This disparity is insufficient to support a denial of discharge. There was no testimony about any of the furniture being missing.

As to Adversary No. 385–3337, the Court finds that InterFirst failed to meet its burden of proof to show that InterFirst had reasonably relied on the February, 1983 and April, 1984 financial statements of Charles Morris, or that Mr. Morris made such statements with intent to deceive. Accordingly, in such adversary, Plaintiff's complaint for relief should be denied and Plaintiff should take nothing.

The Morris' decision to omit the information contained in the three ERISA plans was on advice of counsel who had complete information regarding the ERISA facts. The inference of fraud with respect thereto was rebutted. *In re Sharp*, 16

B.R. 226 (Bankr.S.D.Fla.1981); *In re Mascolo*, 505 F.2d 274, 277 (5th Cir.1974); *In re Cycle Accounting Services*, 43 B.R. 264 (Bankr.E.D.Tenn.1984).

The Trustee's objection in Adversary No. 385–3338 regarding the omission of stock is especially troublesome in view of the listing of the stock on Mr. Morris' financial statement with the bank.

The right to discharge is statutory and the courts do not have discretion to deny discharge absent specific proof of an intent to defraud creditors or some other act which rises to the level necessary to establish one of the statutory grounds for denial of discharge. *See, In re Schnoll*, 31 B.R. 909 (Bankr.E.D.Wis.1983); *In re Terkel*, 7 B.R. 801 (Bankr.S.D.Fla.1980), *citing, Spach v. Strauss*, 373 F.2d 641 (5th Cir. 1967); *Jones v. Friendly Finance Discount Corp.*, 490 F.2d 452 (5th Cir.1974) (provisions for denying discharge must be construed liberally in favor of the debtor and strictly against the objecting creditor). It is "well established that a debtor should be granted a discharge unless there is an intentional effort made to defraud". *In re Cohen*, 47 B.R. 871 (Bankr.S.D.Fla.1985).

Nonetheless, the "duty is upon the debtor to honestly and fully answer the questions in the petition". *In re Mazzola*, 4 B.R. 179, 183 (Bankr.D.Mass.1980); *In re Tabibian*, 289 F.2d 793, 797 (2nd Cir.1961). *See also, In re Moynagh*, 560 F.2d 1028 (1st Cir.1977).

However, Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements. *See, e.g., In re MacDonald*, 50 B.R. 255, 259 (Bankr.N.D.Ga.1985) in which the court concluded that "discharge denial of § 727(a)(4)(A) cannot be imposed where the false statement was created by a simple mistake or inadvertance". In *MacDonald*, the debtor failed to list a judgment of a creditor, a lawsuit which was then in progress, a transfer of property to the debtor's wife found not to be fraudulent and a Lincoln Continental which was

**428**

actually owned by the debtor's corporation. The Court concluded:

> [I]n total, the few minor errors in the debtor's petition do not reach the level of 'reckless and cavalier disregard for the truth.' *In re Gonday*, 27 B.R. [428] at 433 [Bankr.M.D.La.1983]. Rather they are few in number and insignificant in effect, were corrected by amendment, and do not justify a discharge denial under § 727(a)(4) of the Code.

*MacDonald, supra*, at 259. Many courts have adopted a rule of reason with regard to § 727(a)(4)—the mistake must be intentional and generally material. *But see, In re Cycle Accounting Services*, supra, *at 272; Farmers Co-Op Ass'n. of Talmage v. Strunk*, 671 F.2d 391 (10th Cir.1983) (although construing the Act, the court stated that detriment to a creditor was not necessary for a determination that discharge should be denied because of false and inadequate information on the schedules). *Also see, In re Cycle Accounting Services, supra*, 43 B.R. 264, 272, where the court pointed out that prejudice to creditors is not a necessary element in denying a discharge based on a false statement or omission in a debtor's schedules; such court concurs with the statement that the Bankruptcy Act is not aimed at large concealments, but all concealments of property.

The court, in *In re Gugliada*, 20 B.R. 524, 533 (Bankr.S.D.N.Y.1982), stated that the focus of an inquiry under § 727(a)(4) should center on

> 'whether the inquiry bears a relationship to the bankrupt's business transactions or his estate ... or concerns the "discovery of assets, business dealings and relations of the bankrupt, the existence and disposition of his property and debts and the like" ' [Citation omitted].

In *In re Mazzola, supra*, the court noted the duty of disclosure still rested principally with the debtor.

> ... The duty is upon the debtor to honestly and fully answer the questions in the petition; the trustee and the creditors should not be forced to search out the true state of affairs. [Citation omit-

ted]. ('The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.')

\* \* \* \* \* \*

I find that the statements were made with a calculated disregard for the importance of documents which were signed under penalty of perjury and on which a determination on the request for a discharge would be made. This reckless disregard for the truth is the equivalent of the fraudulent intent necessary to bar a discharge.

*Id.* at 183. *Accord, In re Cycle Accounting Services, supra*, at 272.

Any omission, however, must rise to the level of an intentional and willful defrauding of the creditors. *In re MacDonald, supra* at 259. *But see, In re Gonday*, 27 B.R. 428 (Bankr.M.D.La.1983). A *"series"* of mistakes or omissions, even if innocent in themselves, can constitute evidence of a "pattern of reckless and cavalier disregard for the truth". *In re Gonday, supra*, at 433, *citing, In re Diodati*, 9 B.R. 804 (Bankr.D.Mass.1981).

Thus, courts look at the circumstances surrounding the omission to determine if indeed the omission was intentional. *See, In re Ailetcher*, 49 B.R. 681 (Bankr.D.Hawaii 1985) (extreme differences in original petition and amended petition in which debtor acknowledged that his omission regarding his income for the previous year which he listed at zero, but amended to $7,000, showed sufficient intent, or, at least, reckless disregard for truth to warrant denying discharge under § 727(a)(4). *See also, In re Cycle Accounting Services, supra*, at 270, where the court discusses the burden of proof under Bankruptcy Rule 4005. The court denied discharge under § 727(a)(4) because the debtor omitted listing on the schedules his right to payments from one oil company, but listed his right to payments from another oil company. The court recognized the circumstantial evidence is sufficient to prove an intent to omit assets in the omission of one oil com-

pany's payments because inclusion of another oil company's payments was illogical and, thus, probably intentional. The *Cycle Accounting Services* court also ruled that the debtor's understatement of income by almost $2,500 was intentional in light of the fact that the debtor was an accountant and should have easily been able to calculate his income for the previous year. *In re Alvarez,* 26 B.R. 295 (Bankr.S.D.Fla.1982) (although decided under § 727(a)(2), the court found that the omission by the debtor, a doctor who forgot to list $200, was unintentional, and, thus, refused to deny discharge for this admittedly minor omission). The lower the value of the omission, the more reasonable the explanation of unintentional omission appears.

Bankruptcy Courts have found that omitting stock which has a *de minimus* value is not normally sufficient to deny discharge. The court in *In re Terkel,* 7 B.R. 801, *supra,* concluded that, in a situation in which the debtor omitted listing his stock in a corporation,

> The pattern of actions by the defendant and his attorney, who prepared the schedules, suggests carelessness rather than fraudulent intent. Defendant revealed his ownership of the stock at the § 341 meeting. This was not a surprise to plaintiff, who already knew of defendant's ownership of the stock because of their previous dealings, which solely concerned that corporation. The corporation was defunct. Plaintiff did not carry his burden of demonstrating that the stock had any value, and it appears that the stock in fact had no value. At the time of defendant's petition, the corporation owned a couple hundred dollars worth of assets, and debtor's schedules allude to one debt of the corporation, which alone would probably equal the assets. It is apparent that the trustee could have realized no income from the sale of the stock. Because of the negligible, if not non-existent, value of the stock, defendant had little to gain from the nondisclosure, and plaintiff, or any other creditor, did not, in fact, suffer by it. Defendant's misrepresentation in his schedules was not a ma-

terial one and does not justify denying him a discharge.

*Id., supra* at 803–04.

Similarly, the court in *In re Gugliada, supra,* ruled that a debtor's failure to list as an asset his stock in a then defunct corporation did not constitute a willful omission.

> ... All four creditors in this case knew that Frascarola & Co., Inc. was dissolved and inactive some years before the debtor filed his Chapter 7 petition. Although this is no excuse for the debtor's failure to comply literally with the disclosure requirements under the Bankruptcy Code, nevertheless, this lapse in form over substance should not of itself result in a determination that the debtor 'knowingly and fraudulently' made a false oath by not disclosing the existence of these shares. As was stated in *In re McCrea,* 161 Fed. 246 at 249 (2d Cir.1908):
>
> > 'A bankrupt is not guilty of making a false oath when he omits from his sworn schedule securities which are absolutely worthless.'
>
> Manifestly, an average debtor might reasonably believe that the stock was of no value and therefore forget to mention it in the schedules.

*In re Gugliada, supra* at 528–29. *Accord, In re Mordente,* 35 B.R. 973, 978 (Bankr.S. D.N.Y.1983).

In the instant case, the stock was worth, at the least, $6,500. Debtor argues that taking into account tax consequences of a distribution prior to January 31, 1985 reduces the value further. Debtor had previously listed the stock as an asset for purposes of procuring a loan, but failed to list the stock on his original petition. The value of the stock precludes application of the *McCrea* doctrine that allows discharge when the debtor fails to list worthless stocks. The circumstances are also troubling in so far as the debtor would not likely forget an asset of this consequence.

In *In re Tabibian, supra,* the court stated:

... The referee felt that the false answer in the petition was 'cured' by his subsequent testimony at the first meeting of creditors. As a 'rule of law,' stated broadly, the referee was incorrect. 'The very purpose of the statement of affairs is to give dependable information without need of going further.' *United States v. Stone,* 2 Cir., 1960, 282 F.2d 547, 553 and footnote 3. To warrant denial of a discharge, however, the misstatement must have been fraudulent; in determining the bankrupt's state of mind, the referee was entitled to consider the later disclosure as some evidence of innocent intent. Here the small size of the transaction, the brief interval between the statement and the first meeting, and the spontaneous nature of the disclosure coupled with fairly plausible explanations of the transfers themselves were enough to warrant the referee's finding. . . .

*In re Tabibian, supra,* at 797. *Accord, In re Terkel, supra,* in which the Bankruptcy Court declined to deny a debtor's discharge where the debtor's failure to list an asset was the result of carelessness and stated:

This court does not condone carelessness in the preparation of bankruptcy schedules or in complying with all requirements, but the denial of discharge to a debtor is a step not to be lightly taken, and one not merited here.

*Id.* at 804.

█ Debtor's failure to list the stock is very troubling and I find his credibility on this issue is marginal in spite of the lengthy prospectus and complex nature of the Wage Plan. However, taking into consideration all the evidence reflected hereinabove and in light of the legal standards applied by the majority of Bankruptcy Courts, the Court finds that the Trustee failed to meet his burden of proof to show that the omission of the stock was fraudulently done.

Judgment will be entered denying both the Trustee's and InterFirst's Complaints.