**In re Edward R. WOERNER, Debtor.**

**SPRAGUE, THALL & ALBERT, Plaintiff,**

v.

**Edward R. WOERNER, Defendant.**

**Bankruptcy No. 84–01980K.
Adv. No. 85–0739K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 12, 1986.

Counterclaim for attorney's fees pursuant to 11 U.S.C. §§ 523(d) should this Court determine that the debt owed to the Plaintiff is discharged despite the Plaintiff's Complaint.

The basis of the Plaintiff's objection to the Debtor's discharge is that the Debtor made false oaths in connection with his Petition for Bankruptcy. The Plaintiff further seeks that the Debtor's debt to the Plaintiff in the amount of $149,229.83 be found non-dischargeable on the theory that the Debtor had obtained the Plaintiff's services by false representations or actual fraud.

A non-jury trial of this adversarial matter commenced on October 1, 1985. This matter was then continued until April 8, 1986, at which time the Plaintiff completed its case. Prior to offering any testimony in defense, the Debtor moved for a dismissal of this action pursuant to Bankruptcy Rule 7041, which incorporates Federal Rule of Civil Procedure 41(b). We will grant the Debtor's Motion and dismiss the Plaintiff's case.

Richard A. Sprague, Bruce L. Thall, William K. Doak, Stephen V. Yarnell, Philadelphia, Pa., for Creditor, Sprague, Thall & Creamer.

Stephen H. Silverman, King of Prussia, Pa., for debtor.

Stephen Raslavich, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This is an adversarial proceeding in which the Plaintiff, a Philadelphia law firm, objects to the discharge of the Debtor, Edward R. Woerner (hereinafter "the Debtor"), a former client, pursuant to 11 U.S.C. § 727(a)(4)(A) and (B). Alternatively, the Plaintiff seeks to determine the dischargeability of the debt of $149,229.83 owed to it by the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A). The Debtor has filed a

### I. *Findings of Fact*

1. The Plaintiff is the law firm of Sprague, Thall and Albert, and it is a creditor of the Debtor by virtue of an unsatisfied judgment in the amount of $149,229.83. (T33–34)[1]

2. The Plaintiff was retained by the Debtor in May of 1983 to represent him on the charge of first degree murder. Both the Debtor and his father, Russell E. Woerner (hereinafter "the Father"), signed a retainer agreement. (T5, 14, 99)

3. The retainer agreement provided that the Debtor would pay a non-refundable retainer of $50,000.00 to the Plaintiff, against which the Debtor would be charged $150.00 per hour for the time of each attorney who worked on the Debtor's criminal case. A later agreement between the Plaintiff and the Debtor provided that Debtor would also keep up a separate retainer account of $3,000.00 for expenses. (T5, 16, 99)

**1.** References to the transcript of the October 1, 1985, hearing are abbreviated "T".

4. The Plaintiff did receive the $53,-000.00, which was paid by the Father. (T10, H17)[2] Additional payments totalling $4,860.00 were received by the Plaintiff from the Father between July 11, 1983, and October 24, 1983. These payments were credited toward the Debtor's expense account. (T21–24)

5. The Debtor's criminal trial commenced on October 17, 1983. (T31) Immediately prior thereto, on October 15, 1983, a billing statement was issued by the Plaintiff which showed a credit balance of $10,-283.50 on the attorney fee retainer, and a balance due of $6,563.67 on the costs and expenses account. Additionally, the Statement reflected an additional $3,000.00 retainer due on the costs and expense portion, for a total due of $9,563.67. (T24)

6. Prior to the commencement of the trial, the Plaintiff was concerned about the Debtor's ability to pay the fees and costs over and above what had already been paid. (T6, 11) The Father was also concerned about the rapid depletion of the initial $53,000.00 payment and wrote a letter to the Plaintiff to that effect in August of 1983. (H20) This letter also made reference to the Debtor's concern about the rapid depletion of the $53,000.00 retainer. The Plaintiff and the Debtor engaged in an unspecified number of discussions concerning the payment of the Plaintiff's fees and costs in connection with the criminal defense of the Debtor. (T16–17, 20, 26. H9–10, 19)

7. The Debtor understood that more attorneys' fees would be incurred as a result of the trial itself and the Debtor assured the Plaintiff that he would pay these fees and costs. (T7, 11. H10, 13–17)

8. The Plaintiff had knowledge of the financial conditions of the Debtor, and of the Father. The Plaintiff knew that the Debtor was a salaried employee, earning approximately thirty thousand ($30,000.00) dollars per year. The Plaintiff was also aware of the Debtor's modest standard of living, e.g., that he resided in a one-bedroom apartment directly over a commercial establishment, because the Plaintiff maintained the Debtor's apartment by payments from the Debtor's expense account. (T7, 21. H10, 25–26)

9. The Plaintiff was aware that the Father was seventy-six (76) years old, retired on a modest pension, had paid half of his life savings to his life care residence and that the other half of his life savings had gone to pay the $53,000.00 fee and cost retainer to the Plaintiff. This information was revealed to the Plaintiff in the Father's letter to the Plaintiff of August, 1983. (H20–25, D–18)[3]

10. On November 15, 1983, the Plaintiff issued a billing statement which showed attorney fees of $89,706.50 due, as well as expenses advanced of $18,400.00. The Statement also demanded the payment of an additional $3,000.00 retainer on the expense account. (T31)

11. The December 15, 1983 billing statement issued by the Plaintiff reflected a payment of $500.00 received on November 21, 1983, from the Debtor which was credited against the expenses owed in the amount of $28,331.03, attorney's fees owed in the amount of $120,846.50, and a demand for the $3,000.00 expense retainer for a total of $152,177.53. (T32)

12. On January 15, 1984, the Plaintiff issued a billing statement which showed that the total expenses owed amounted to $31,334.92 and that the total attorney's fees owed amounted to $120,891.50, for a total of $152,226.42. The billing statement issued by the Plaintiff on February 15, 1984, showed the same amounts due as of the January, 1984, statement. (T32–33)

13. The March 15, 1984 and April 15, 1984 billing statements are identical and showed a total balance due and owing of $149,229.83, the exact amount of the Plaintiff's claim and judgment against the Debtor. This final amount reflects a deduction of the $3,000.00 expense retainer which had

---

**2.** References to the transcript of the April 8, 1986 hearing are abbreviated "H".

**3.** References to the Debtor's exhibits are abbreviated as "D–Number".

previously been added to the amount due and owing from the Debtor. (T33–34)

14. The Plaintiff was aware that if the Debtor was convicted of first degree murder, he could be sentenced to either life imprisonment or death. (H28)

15. There has been no evidence offered as to whether the Debtor denied his liability to the Plaintiff for the legal services performed. Likewise, there has been no evidence offered as to whether the Debtor objected to the amount of the fees and costs other than the letter of August, 1983, from the Father to the Plaintiff.

16. Although the Plaintiff *argues* strenuously about the Debtor's intent respecting the payment of the Debtor's legal fees, the Plaintiff offered no evidence of the Debtor's intent to defraud the Plaintiff and no evidence of fraud. In fact, there was no evidence that the Debtor did not intend to pay the Plaintiff for its legal services when the services were rendered or when promises or assurances of payment were made by the Debtor.

17. On June 20, 1984, the Debtor filed a Petition for Relief under Chapter 7 of the Bankruptcy Code. In Schedule B–2, the Debtor failed to itemize his personal property. Instead, the Debtor ascribed value or dollar amounts to general categories of property. (P–7)[4]

18. The Section 341 Meeting of Creditors was held on September 11, 1984, at which the Debtor was examined under oath by the Trustee concerning the information set forth on the Debtor's Petition, Schedules and Statement of Affairs. The Debtor affirmed the accuracy of those documents. The Plaintiff sent one of its lawyers to attend this meeting. (P–9, T113–114 and H11) Only portions of the Debtor's § 341 examination were admitted into evidence by the Plaintiff. (T114)

19. On Schedule A–3, the Debtor listed a debt to his Father's estate in the amount of $53,500.00. (P7, T88)

20. On June 13, 1985, the Plaintiff took depositions of the Debtor, only portions of which were admitted into evidence at the trial in this matter. (T54–101)[5]

21. At the depositions, the Debtor basically affirmed the accuracy of his original Petition, Schedules and Statement of Affairs, with some corrections. (T57–58)

22. The Debtor's explanation for these changes was that he had made a more detailed analysis since originally reviewing and signing his Petition. (T58)

23. The Debtor affirmed that he had $50.00 "cash on hand" at the time that he signed his Petition. (T58)

24. The Debtor did not know exactly how much money he had in the bank when he signed his Petition because of the fluctuating nature of his checking accounts. Furthermore, the Debtor assumed that the category "cash on hand" included any monies in his checking account. (T60)

25. At the deposition, the Debtor testified that he owned a rangefinder camera without interchangeable lenses (T70–71); that he had not owned any interchangeable lenses or cameras between January, 1983, and June, 1984 (T73); and that he had not owned a slide projector before June, 1984. (T76)

26. Subsequent to the Debtor's deposition, he was given the opportunity to review the transcribed deposition for accuracy. Before verifying the truthfulness of his deposition, the Debtor made certain corrections. (Dep. 178–179)

27. The substance of these corrections were that the Debtor *had* owned a 35 millimeter camera with interchangeable lenses between January, 1983, and June, 1984, and that he had owned a slide projector before June, 1984. (T71–76)

---

**4.** References to the Plaintiff's exhibits are abbreviated as "P–Number".

**5.** References to the transcript of the Debtor's deposition taken on June 13, 1985 are abbreviated "Dep." These excerpts were placed in the record by reference to page and line. However, any portions of the Debtor's deposition which were read into the record at the hearing on October 1, 1985 are referred to as "T." See footnote 1.

28. The uncontradicted testimony of the Debtor concerning stereo equipment is that he had some such equipment in the spring of 1983, but that he sold it at that time and did not own a stereo at the time of filing for Bankruptcy. (T85–86)

29. At the deposition, the Debtor identified an omission on Schedule B–3 with respect to a profit-sharing plan, explaining that he had not been aware that it "pertained" to his Bankruptcy Petition. The Debtor had previously withdrawn money from the profit-sharing plan prior to his filing for Bankruptcy. (Deps. 28–29)

30. Although the Debtor was aware of the existence of his pension plan in June of 1984, he did not know that any monies were available to be withdrawn. (T97–98)

31. The Plaintiff argues that the Debtor's original failure to list either his $98.85 deposit with his bank, or his stereo equipment, or his camera equipment, or his pension plan and a profit-sharing plan on his Petition and Schedules amounted to false oaths.[6]

32. On September 16, 1985, the Debtor filed Amendments to Schedules B–2, B–3, B–4, and the Statement of Financial Affairs. The Debtor's Amendments listed items which were not included in the Debtor's original Schedules, e.g., $98.85 deposited with a bank, a profit-sharing plan valued at $4,491.79, an employer pension plan valued at $2,534.14, and a detailed list of assorted and miscellaneous household goods, supplies, furnishings, books, and wearing apparel. The Debtor's Amendments specifically list camera equipment consisting of a camera and flash attachment, and a slide projector. (P–11)

33. The Debtor's omissions from his original Schedules of the items mentioned in paragraph 31 *supra* do not amount to false oaths.

34. There was no actual fraudulent intent on the part of the Debtor in making these omissions.

35. The Debtor's original failure to list $98.85 on deposit with his bank, which was explained by the Debtor at deposition (T60) and which later appeared on the Debtor's Amended Schedules (P–11), does not amount to the fraud necessary to establish a false oath. Further, this omission is immaterial.

36. The fact that the Debtor changed the substance of his answers concerning the camera equipment and slide projector *before* he signed the verification of the truthfulness of his answers at deposition does not constitute a false oath.

37. The Debtor made no material false statements concerning his Mastercard Account. (Dep. 100–101, 103–104, 158–159)

38. The Debtor's omission of his profit-sharing plan and his pension plan were not material.

39. The Debtor's filing of Amendments to his Schedules on September 16, 1985, negates any suggestion that the omissions amounted to false oaths.

40. The Debtor's Amendments increased the value of property claimed as exempt from $1,950.00 to $9,354.78.

41. Nevertheless, all of the items which were omitted from the Debtor's Petition and Schedules and which were included in the Debtor's Amendments are properly exempted pursuant to the Debtor's Amended Schedule B–4. (P–11)

## II. Conclusions of Law

1. This Court has jurisdiction of this proceeding under 28 U.S.C. § 1334 and 28 U.S.C. §§ 157(b)(2)(I) and (b)(2)(J).

2. The Plaintiff's Complaint objecting to the Debtor's discharge must be dismissed because of the Plaintiff's failure to carry its burden of proof, under the applicable clear and convincing evidence standard, that the Debtor knowingly and fraudulently made false oaths or presented a false

---

**6.** Although the Plaintiff's Complaint also complains of the Debtor's failure to list firearms and a computer, the Plaintiff admitted in its Brief that these items cannot form the basis for denial of a discharge, as the Plaintiff did not offer any evidence respecting these items at the hearing.

claim in connection with his Bankruptcy Petition.

3. The Plaintiff's Complaint for a determination of the non-dischargeability of the Debtor's obligation for the Plaintiff's legal services for the Debtor must be dismissed for lack of any proof as to any fraudulent conduct on the part of the Debtor in obtaining those services. Therefore, the Debtor's debt of $149,229.83 owed to the Plaintiff is dischargeable.

## III. *Discussion*

 Federal Rule of Civil Procedure 41(b) states in pertinent part:

> ... After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).[7]

This Federal Rule, per Bankruptcy Rule 7041, applies in bankruptcy proceedings.[8]

 In examining the facts and the applicable law, we find that the Plaintiff has shown no right to relief, and we shall therefore grant the Debtor's Rule 41(b) motion to dismiss. As the trier of fact, this Court has the right to apply its own judgment to weigh the Plaintiff's evidence and to consider the law at this juncture, the close of the Plaintiff's case. *O'Brien v.*

*Westinghouse Electric Corp.*, 293 F.2d 1 (3d Cir.1961).

 The Plaintiff objects to the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and (B), which provide, in pertinent part, as follows:

> (a) The court shall grant the debtor a discharge, unless—
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account;
> (B) presented or used a false claim;
> . . .

The analysis of whether a discharge should be denied must start with the premise that the denial of discharge to a debtor is not a step to be taken lightly. Objections to discharge must be construed strictly against the objector and liberally in favor of the debtor. *Matter of Decker*, 595 F.2d 185, 187 (3d Cir.1979); *In re Gelfand*, 47 B.R. 876, 879 (Bankr.E.D.Pa.1985); *In re Kunec*, 27 B.R. 650 (Bankr.M.D.Pa.1982); *In re Whiting*, 10 B.R. 687 (Bankr.E.D.Pa. 1981). Public policy requires that objections to discharge not be easily granted. The filing of a bankruptcy petition would be of little aid to debtors in need of a "fresh start" if creditors could easily attack the granting of a discharge.

 The Plaintiff has the burden of proving his objection to discharge. Bankruptcy Rule 4005. In order for the Plaintiff to sustain its burden of proof under 11 U.S.C. § 727(a)(4)(A) or (B), it must establish that there was actual fraudulent intent on the part of the debtor. Actual fraudulent intent means "an actual intent on the part of the bankrupt to hinder, delay or defraud his creditors." *In re Topper*, 229

---

7. The pertinent part of Rule 52(a) is: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and judgment shall be entered pursuant to Rule 58; ...".

8. B.R. 7041 also provides: "[e]xcept that a complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's insistence without notice to the trustee and only on order

of the court containing terms and conditions which the court deems proper." Presumably, this means that the Trustee, Stephen Raslavich, Esquire, who has apparently not had any role in this matter, must receive notice if the Plaintiff herein intended to voluntarily cease pursuit of this matter. Since the Plaintiff continues to vigorously pursue this matter, notice to the Trustee is not required and Rule 41(b) applies in full force and effect.

F.2d 691, 692 (3d Cir.1956); *In re Cohen*, 47 B.R. 871, 875 (Bankr.S.D.Fla.1985). It is "well established that a debtor should be granted a discharge unless there is an intentional effort made to defraud. *In re Cohen*, 47 B.R. 871 (Bankr.S.D.Fla.1985)." *In re Morris*, 58 B.R. 422, 427 (Bankr.N.D. Tex.1986). We believe that the applicable standard of proof under § 727(a)(4) is that the Plaintiff must prove its case by clear and convincing evidence because this Section turns on the establishment of fraud. *See Brown v. Buchanan*, 419 F.Supp. 199, 201–02 (E.D.Va.1975). It is uncontrovertable that where fraud is alleged, the fraud is never presumed but must be established by clear and convincing evidence. *Ratay v. Lincoln National Insurance Co.*, 378 F.2d 209 (3d Cir.), *cert. den.* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); *Jett v. Zink*, 362 F.2d 723 (5th Cir.), *cert. den.* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966); *Borowicz v. Chicago Mastic Co.*, 367 F.2d 751 (7th Cir.1966); McCORMICK ON EVIDENCE 796–97 (E. Cleary 2nd ed. 1972). It has been held under Pennsylvania law, that the party who alleges fraud must prove facts by evidence that is clear, precise and indubitable, and the evidence must be so cogent as to enable a jury to come to a clear conviction without hesitancy of the truth of the precise facts alleged. *Ratay v. Lincoln National Life Insurance Co.*, *supra* at 212.

We are further persuaded of the appropriateness of the clear and convincing standard of proof where fraud is alleged under 11 U.S.C. § 727(a)(4) by our review of the standard of proof under 11 U.S.C. § 523(a)(2)(A) which is discussed at length later in this Opinion. Since the determination of the dischargeability of a debt, where fraud is alleged, is to be made under the stricter standard of clear and convincing evidence, it also follows that the issue of the debtor's discharge, where fraud is alleged under § 727, must be determined under the stricter standard of proof. It would be illogical for us to apply a lesser standard of proof when a debtor's entire discharge is being challenged than when the dischargeability of particular debt is being challenged.[9]

Even if a false statement could be established in the case at hand, it must be shown that such a statement relates to a material matter. *In re Steiker*, 380 F.2d 765 (3d Cir.1967). Matters so trivial in nature as to have but little effect upon the estate and upon creditors have been treated as immaterial. *In re Waddle*, 29 B.R. 100 (Bankr.W.D.Ky.1983). The materiality of the false oath or statement does not require that a creditor be prejudiced. However, the question of materiality goes to the issue of its pertinence to the discovery of assets. *Matter of Brooks*, 58 B.R. 462, 467 (Bankr.W.D.Pa.1986).

The Plaintiff alleges that the Debtor made false oaths (1) in his Schedules of property, (2) at the § 341 creditors' meeting, and (3) at depositions in connection with these bankruptcy proceedings. The Plaintiff alleges that the omissions in the Debtor's Schedules amount to false oaths and fraud. We do not agree. The Plaintiff has shown that, in the Debtor's original Schedules, he failed to list certain camera equipment purchased just prior to the Debtor's filing for bankruptcy; $98.85 on deposit with a bank; a pension plan valued at $2,534.14; a profit-sharing plan valued at $4,491.79; and an itemization of personal property on Schedule B–2. The Plaintiff's allegations of false oaths in connection with the § 341 creditors' meeting and in connection with the Debtor's statement under oath at his deposition encompass the same omissions listed above. Since the analysis will be the same in all three (3) situations, we shall discuss, in the main, the alleged false oaths in the Debtor's original Schedules.

**9.** We are aware of *In re Robinson*, 506 F.2d 1184 (2nd Cir.1974) which is cited by the Plaintiff as authority that the applicable standard of proof under § 727(a)(4) is preponderance of the evidence. We note the lack of discussion or analysis as to the standard of proof where fraud is alleged and we decline to follow the Second Circuit's mere affirmation of the Bankruptcy Referee's finding that the burden of proof had been met by a preponderance of the evidence.

The Plaintiff cites *In re McDonald,* 16 B.R. 621 (Bankr.S.D.Fla.1981); and *In re Hirsch,* 14 B.R. 59 (Bankr.S.D.Fla.1981), in support of its assertion that the Debtor's omissions are sufficient grounds to deny discharge. Unfortunately for the Plaintiff, these cases do not support the Plaintiff's position. In *McDonald,* the Debtor failed to list significant assets, e.g., an interest in a trucking business which the Debtor falsely represented as being out of business when it was an ongoing business, the sale of his painting truck and pressure cleaning equipment within one year of filing his petition, and the constructive ownership of a 1979 Toyota and unspecified furniture and personal property. 16 B.R. at 622. After a hearing and having had the opportunity to observe the witness, the *McDonald* court found that the Debtor had intended to divest himself of his ownership of all his property and intended to conceal the remainder of his property with the specific purpose of misleading, defrauding and hindering his creditors. *Id.* at 623. In *Hirsch,* the Court denied discharge after finding that the Debtors had omitted several material facts from their Schedules, e.g., the Debtors omitted any reference to the Debtor's concession (business), as well as having omitted receipt of income, ownership of stock and ownership or possession of $1,000.00 in a checking account. 14 B.R. at 61. Moreover, the *Hirsch* court found other lesser but deliberate omissions which standing alone would not justify denial of discharge but together with the material omissions showed a pattern which it found to be indicative of the debtors' wrongful intent. *Id.* The *Hirsch* court made a determination of credibility after trial and based upon inferences drawn from the circumstances and observation of witnesses. *Id.*

 Several points can be made in response to the Plaintiff's arguments. First of all, the mere omission of property from the schedules does not necessarily establish fraudulent intent on the part of the debtor. *In re Taub,* 98 F.2d 81 (2d Cir.1938). The Plaintiff has not *shown* any actual intent to defraud his creditors. The

case *sub judice* is easily distinguishable from *McDonald* and *Hirsch* if we were only to consider the qualitative nature of the Debtor's omissions. However, unlike the facts in these cases, the omissions herein were not business related, nor were they material. Clearly the omissions do not reach a level such that this Court would deem them to constitute a fraud upon the creditors of the Debtor's estate. *In re Cohen, supra.* Neither do we find that the omissions in the Debtor's Schedules rise to the level of "reckless and cavalier disregard for the truth," *In re Gonday,* 27 B.R. 428, 433 (Bankr.M.D.La.1983), which would support a denial of discharge. Even in a case where $6,500.00 worth of stock was omitted from the Debtor's Schedule, the court in *In re Morris,* 58 B.R. 422 (Bankr.N.D.Tex.1986) declined to deny discharge. The Court states:

> Debtor's failure to list the stock is very troubling and I find his credibility on this issue is marginal in spite of the lengthy prospectus and complex nature of the Wage Plan. However, taking into consideration all the evidence reflected hereinabove and in light of the legal standards applied by the majority of Bankruptcy Courts, the Court finds that the Trustee failed to meet his burden of proof to show that the omission of the stock was fraudulently done. *Id.* at 430.

We similarly find that the Plaintiff has failed to meet its burden of proof and failed to show that the omissions complained of were fraudulent.

 Secondly, in the case *sub judice,* the testimony clearly indicates that the Debtor amended his Schedules to include those items originally omitted. The fact that the Debtor amended his Schedules is corroborative of good faith intent. *In re MacDonald,* 50 B.R. 255 (Bankr.D.Mass. 1985). "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *In re Morris, supra,* 58 B.R. at 427. The Debtors in *McDonald* and *Hirsch* did not amend their Schedules to

correct the omissions. Additionally, the Plaintiff cites *In re Nazarian*, 18 B.R. 143, 147 (Bankr.D.Md.1982), as authority for the Plaintiff's assertion that the Debtor's failure to promptly amend Schedules was reckless indifference to the truth. Our reading of that case leads us to the conclusion that the Plaintiff's reliance is misplaced, as there were many other factors which led the *Nazarian* court to find reckless indifference to the truth on the part of the Debtor there. For example, the Debtor there, *inter alia*, did not amend his Schedules, and had omitted mention of more than $20,000.00 cash in his bank accounts. In contrast, the sum of money omitted in the case *sub judice* is $98.85.

 Thirdly, the Debtor's Amended Schedules also reflect that the entire value of the omitted items now included on Amended Schedule B–4 are totally exempt. We do not construe the Debtor's failure to itemize and list certain property now claimed as exempt as concealment or as indicative of his fraudulent intent to defraud creditors. *See In re Lippow*, 92 F.2d 619 (7th Cir.1937). We shall treat the claimed exemptions as exempt, there being no timely objection to the Debtor's claim of exempt property.[10] Being exempt, these items are not pertinent to the discovery of assets as would be available for distribution to creditors. *See Matter of Brooks, supra.*

 Fourthly, assuming arguendo that the omissions are deemed to be false statements despite the fact of their inclusion in the Debtor's Schedules, we find the omissions to be immaterial.

The Plaintiff relies in great part upon *Farmers Co-Operative Association, Talmage, Kansas v. Strunk*, 671 F.2d 391 (10th Cir.1982) (hereinafter *"Farmers"*). However, *Farmers* is distinguishable on its facts and upon application of the law. At first glance, it could appear that *Farmers* is on point, since the Debtor there stated that he had no monies on deposit with any

bank on his original Schedule and affirmed that Statement at his § 341 meeting of creditors. Later examination of the Debtor's bank statements showed that in fact the Debtor had $3,277.00 in his checking account at the time of filing his Petition and $1,976.30 in this account at the time of his § 341 meeting of creditors. However, the case *sub judice* is factually distinguishable, since the amount omitted, $98.85, is *de minimis* and immaterial. The *Farmers* Court clearly found the debtor's omission to be an intentional concealment. We do not so find the Debtor's omission of $98.85 to amount to concealment or fraud.

Additionally, the *Farmers* Court relied on the fact that the debtor continued to write checks on his account after claiming that there were no monies in it and, consequently, the Court inferred fraudulent intent by that conduct. No evidence was presented concerning the Debtor's activities respecting the $98.85 in his account. Another factual distinction is that the Debtor in *Farmers* tendered a check in the amount of $3,277.00 to the Trustee, which appears to have indicated that creditors were to receive some amount of distribution and that the omission of the $3,277.00 would lessen the amount of distribution, thus leading the *Farmers* Court to the conclusion that the debtor intentionally and fraudulently concealed monies to avoid or lessen distribution to his creditors. However, since there was no distribution to creditors in the case *sub judice*, it is distinguishable from *Farmers*.

In any event, we decline to follow the analysis and holding of *Farmers*. We are much more persuaded by the analysis of *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971), in which the Court found no fraud when the debtors incorrectly listed $24.50 cash on hand instead of the correct amount of $2,175.00, and despite the additional omission of accounts receivables of $4,143.28 from his Schedules. The *Kentile Floors* Court found that the debt-

---

**10.** Even if we were to consider the validity of the Debtor's claimed exemptions, the Plaintiff has not offered any proof that the Debtor is not

entitled to the claimed exemptions. *See* 11 U.S.C. § 522(d).

ors knew of the existence of these assets at the time of filing but, since the record reflected that the omissions were the result of oversight and misunderstanding, the court declined to conclude that the debtors were guilty of a knowing and fraudulent concealment.

██ Of several pieces of property which are complained of as having been omitted, the Plaintiff argued strenuously that the Debtor lied and continues to lie about owning a stereo. However, the Plaintiff offers *no* proof as to this item, but merely contends that the Debtor's testimony about the stereo is so inherently unbelievable that this conclusion is inevitable. We disagree. The only evidence before this Court is the Debtor's testimony of having sold the stereo. We certainly decline to accept the Plaintiff's speculation in lieu of proof.

██ We turn briefly to the Plaintiff's allegations with respect to the § 341 Creditors' Meeting. The Plaintiff cited *In re Braidis,* 27 B.R. 470, 472 (Bankr.E.D.Pa. 1983), for the proposition that a false statement made by the debtor at the § 341 Creditors' Meeting can be a sufficient ground for denying discharge. However, *Braidis* is not applicable in the case at hand. The facts in *Braidis* are that the Debtor had told a different story at the § 341 meeting concerning the circumstances surrounding the disappearance of assets from his testimony at trial. In the case at hand, the only evidence before this Court concerning the § 341 Meeting is six (6) pages of testimony, in which the Debtor affirms the accuracy of his Petition and Schedules. We can only surmise from what is before us that the Debtor was not aware of the inaccuracies until they were brought to his attention at his deposition, which was taken some time later. When he became aware of the inaccuracies, the Debtor then filed his Amendments. This set of facts does not constitute sufficient evidence to disallow the Debtor's discharge.

Moreover, the discharge was denied in *Braidis* for the combined reasons that the Debtor had wrongly and fraudulently made a false statement at the deposition and the § 341 Meeting of Creditors, failed to keep books and records from which his financial condition or business transactions might be ascertained, and failed to explain satisfactorily the loss of his business assets. *Id.* at 471. The last two (2) elements are totally absent here.

We now turn briefly to the Plaintiff's allegations that the Debtor's testimony and explanation concerning his omissions were not credible and should lead us to the conclusion that the Debtor had the requisite fraudulent intent as the basis for denying his discharge. It appears that the Plaintiff wishes us to draw this conclusion from those portions of the Debtor's deposition which the Plaintiff chose to read into the record. We decline to do so for several reasons. Since the Plaintiff chose to present its case in chief in this fashion, instead of calling the Debtor as of cross-examination, this Court was not given the opportunity to observe the Debtor's demeanor. Nevertheless, those explanations of the Debtor, placed before us by the Plaintiff in a piecemeal fashion as excerpts from the Debtor's deposition, appear credible and we do not find the Debtor's explanations to be so incongruous or illogical as to infer fraudulent intent.

Lastly, we address the Plaintiff's contention that the Debtor made certain false statements at deposition concerning his Mastercard account and that these alleged false statements can serve as a basis upon which to deny the Debtor's discharge. Having carefully reviewed the Debtor's testimony, which was placed into record piecemeal, we disagree with the Plaintiff's characterization that the Debtor lied and made false statements.

For all of the foregoing reasons, we decline to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4)(A).

██ The Plaintiff also alleges that the Debtor presented a false claim by scheduling or including the $53,500.00 from the Father as a debt or loan, and that the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(4)(B) on this basis. The record consists of contradictory evi-

dence respecting the nature of the $53,-000.00 payment by the Father to the Plaintiff for the Debtor's criminal defense. The Plaintiff presented the testimony of one of its attorneys that the Debtor stated that this payment was a gift. The Debtor testified in depositions that it was a loan. We find that the Plaintiff failed to carry its burden of proving that the said payment was a gift and therefore a false claim on the Debtor's Schedules. Additionally, it appears reasonable that, while the Father obviously wanted to do everything he could to assist the Debtor in connection with the criminal matter, the Debtor would be expected to repay such a large sum of money to the Father since the Father was living on a limited income and since it represented all of the Father's remaining life savings. We therefore also decline to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4)(B).

The Plaintiff also seeks to have its debt of $149,229.83 be found non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), which provides that a debtor shall not be discharged from any debt "for money, property, services . . ., to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . ., financial condition." In order for the Plaintiff to prevail under this provision, it must prove that "(1) the debtor made a materially false representation; (2) with the intent to deceive; (3) that the creditor relied on that false representation; and (4) that the creditor sustained proximate damage as a result." *In re Gelfand, supra,* 47 B.R. at 879 (citations omitted). "A necessary element under § 523(a)(2)(A) is *actual* fraud rather than merely fraud implied in law. 3 COLLIER ON BANKRUPTCY ¶ 523.08 [4] (15th ed. 1985)." *In re Emery,* 52 B.R. 68, 70 (Bankr.E.D.Pa.1985).

Where the issue turns on proof of an intent to deceive by the debtor, the debtor's fraud must be shown by clear and convincing evidence, a higher standard than proof by merely a preponderance of the evidence. *Matter of Ackerman,* 16 B.R. 640, 644 (Bankr.D.N.J.1981). Therefore, the standard of proof required to prove fraud under § 523(a) is the clear and convincing standard. *In re Emery, supra,* at 70. However, as heatedly as the Plaintiff alleges that it was fraudulently induced to continue its criminal defense in representation of the Debtor, the Plaintiff offers no proof in support of its allegations. There is not a scintilla of evidence offered by the Plaintiff in support of its allegation that the Debtor never had any intention of paying the attorney's fees and costs owed to the Plaintiff in connection with the criminal case. Since the Plaintiff failed to carry its burden of proof under even the lower "preponderance of evidence" standard, it follows that it necessarily failed to meet its burden under the higher "clear and convincing evidence" standard.

Directly on point is *Emery, supra,* decided by Chief Judge Emil F. Goldhaber of this Court. Just as in the case *sub judice,* that case was brought by the debtor's former attorney who sought to have his debt determined non-dischargeable based upon allegations that the debtor had fraudulently induced the Plaintiff to provide legal services which the debtor had no intention of paying. In *Emery,* our senior brother held the debt to be dischargeable, finding that the plaintiff had failed to meet his burden of proof in establishing the requisite fraudulent intent. "The mere breach of contract by the debtor does not, without more, imply the existence of actual fraud." *Id.* at 70.

Furthermore, courts elsewhere have noted that "[a] broken promise does not constitute a fraudulent misrepresentation without *proof* that the promisor never intended to perform when the promise was made." *In re Overmyer,* 30 B.R. 127, 132 (Bankr.S. D.N.Y.1983) (emphasis added) (Complaint objecting to dischargeability of debt for attorneys' fees dismissed for lack of proof as to any fraudulent conduct on the part of the debtor); *In re Todd,* 34 B.R. 633 (Bankr.W.D.Ky.1983). The analytical key is the Debtor's intent. As was the case in *Emery* and *Overmyer,* the case at hand must be dismissed because of the lack of any proof of fraudulent intent.

The only evidence as to the Debtor's intent, aside from the Plaintiff's specula-

tive testimony via two (2) attorneys who represented the Debtor in the criminal case, must be gleaned from the Debtor's response to a particular question at a deposition which was admitted into evidence:

Q: Isn't it true that, at some point, you realized that your legal fees were going to exceed the $50,000.00 retainer payment?

A: Yes.

Q: Okay. And you mentioned that to some of your friends, didn't you, like, for example, Gene Morrison and his wife or Dan Lynch?

A: It's possible.

Q: And you also mentioned to those people that you didn't know how you were going to pay any amount over the $50,000.00, didn't you?

A: Yes.

Plaintiff's Exhibit 14-A, page 79 of the depositions, 1.3-14.

The Plaintiff wishes that this Court draw the conclusion that the above testimony demonstrates the Debtor's intent not to pay. We do not so conclude. At most, the foregoing exchange shows that the Debtor did not know *how* he was going to pay his legal fees.

We are also mindful of the fact that at the time of the Debtor's promises to pay or assurances of payment, he was about to stand trial for first degree murder with the possibility of either life imprisonment or a death sentence if he were found guilty. We believe that under such circumstances, it is highly likely that the Debtor was sincere and earnest in his promises to pay the law firm responsible for keeping him alive and out of jail. In addition to our holding that the Plaintiff has not proven fraud, we are also inclined to believe that the Plaintiff was not even "induced" to continue its representation of the Debtor by the Debtor's promises to pay, as the Plaintiff most probably suspected that the Debtor would not be able to make payments on his bill if he were incarcerated or sentenced to death. Moreover, it is instructive to note that the Father *also* signed the retainer agreement, obligating himself on paying the Debtor's

attorney's fees; that the initial $53,000.00 retainer came from the Father; and that it was the Father who wrote to the Plaintiff in August of 1983 expressing deep concern over the rapid depletion of the retainer and the apparent skyrocketing of attorney's fees and costs. These factors also lead us to believe that the Plaintiff was not "induced" to represent the Debtor solely upon the Debtor's promises to pay. It goes without saying that the Plaintiff expected payment from *either* the Debtor *or* the Father on the basis of the retainer agreement. However, that dashed expectation, due in large part to the Father's death, clearly does not rise to a level sufficient to cause us to find this debt non-dischargeable.

Having made the determination that the debt in question is dischargeable, we shall dismiss the Plaintiff's Complaint, and retain jurisdiction of this matter only for the purpose of consideration of the Debtor's Counterclaim, in which he seeks attorney's fees and costs pursuant to 11 U.S.C. § 523(d).