In re Larry L. BASTROM, Sharla S. Bastrom, Debtors.

FIRST NATIONAL BANK OF WHITE SULPHUR SPRINGS, Plaintiff,

v.

Larry L. BASTROM, Sharla S. Bastrom, Defendants.

Bankruptcy No. 87–40419.
Adv. No. 487/0074.

United States Bankruptcy Court, D. Montana.

Feb. 13, 1989.

Charles F. Moses, Billings, Mont., for debtors.

Joel E. Guthals, Billings, Mont., for First Nat. Bank of White Sulphur Springs.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, a trial was held July 12 and 15, 1988, on the Complaint to Determine Dischargeability filed by First National Bank of White Sulphur Springs against the Debtors/Defendants. The Complaint to Determine Dischargeability was filed on October 14, 1987, and is based on 11 U.S.C. § 523(a)(2), § 523(a)(6), and § 727(a)(2) and (4). The Complaint was subsequently amended on July 12, 1988, to include specificity of the allegations. The Debtors/Defendants have filed Answers to the Complaint and Amended Complaint which deny the material allegations and set forth their affirmative defenses. At the close of trial, both parties were granted leave to file their respective briefs in support of their positions. The briefs have been filed and this matter is deemed submitted.

The Bank and the Debtors originally entered into a loan agreement on October 1, 1985. The loan agreement entitled the Debtors to borrow up to $500,000.00 for the purchase of feeder cattle, feed, and the operation of a feed lot. Pursuant to the

loan agreement the Debtors signed a promissory note and granted the Bank a security interest in all of the Debtors' livestock and feed, and pledged the Bank a security interest in certificates of deposit. The Bank properly perfected all of its security interests. The loan agreement contained numerous conditions and restrictions, such as the Bank would only loan up to 75% of the value of the collateral and the Bank had the right to inspect the Debtors' operation and books. The Bank made numerous advances to the Debtors under the loan agreement, and by June, 1986, the Debtors were obligated for a principal balance of $403,793.25. The Bank, through its right of inspection, discovered in June, 1986, that cattle serving as collateral for the loans were missing. Accordingly, in June of 1986, the Bank requested that the Debtors provide information regarding the missing collateral. The Debtors informed the Bank that the cattle were gone and that some of the proceeds had been transferred to commodity trading accounts. However, the Debtors informed the Bank that they were still desirous of continuing their operations and repaying the loans. In that regard, the parties entered into a Memorandum of Understanding on June 17, 1986. In the Memorandum of Understanding the parties agreed that the Debtors' operations could not fund repayment of the Bank's debt. Therefore, the Debtors and Bank agreed that "it is the best interest of the Borrower to have an orderly liquidation over a reasonable period of time in order to secure the highest value from the sale of the Borrower's business and personal property". The Debtors then agreed in the Memorandum to (A) liquidate their certificates of deposit and turn the proceeds over to the Bank, (B) to assign their interests in commodity accounts to the Bank valued at $10,965.00 and $26,352.57, (C) turn over the cash value of life insurance policies to the Bank, (D) give the Bank a security interest in machinery, equipment, crops, and titled motor vehicles as listed in Exhibit "A" attached to the Memorandum, (E) give the Bank a security interest in all real property listed in Exhibit "B" to the Memorandum, and (F) assign certain notes receivable and

partnership interests, as listed in Exhibit "C", to the Bank and to liquidate them as rapidly as is prudent. The Debtors further agreed in the Memorandum that they will liquidate additional collateral if the debt level with the Bank was not reduced to the funding ability of the Debtors. The Debtors agreed to properly care for their property and stated in the Memorandum that they will not "sell, exchange or otherwise dispose of any collateral without notice to the Bank". The Memorandum further states that "All proceeds from the sale of collateral shall be remitted to the Bank for application upon the primary loan ..." and that, "it is expressly understood that this Agreement shall in no way be construed to waive or nullify any of the Bank's rights under the security agreements heretofore given by the Borrower to the Bank". Subsequent to signing the Memorandum on June 17, 1986, the Bank applied the certificates of deposit against the loan, perfected several security interests, and received some payments. The Debtors were unable to liquidate their property fast enough to satisfy the Bank's debt limit and the Bank attempted to repossess some farm machinery, vehicles and equipment in the spring of 1987. The Bank's attempted repossession was unsuccessful and soon thereafter, on June 15, 1987, the Debtors filed a Petition for Relief under Chapter 7 of the Bankruptcy Code. Subsequently, on October 14, 1987, the Bank filed a Complaint to Determine Dischargeability.

The Bank's Complaint, and subsequent Amended Complaint, allege three counts against the Debtors, to-wit: Count I, that the Debtors made false and fraudulent representations in order to obtain credit (§ 523(a)(2)); Count II, that the Debtors did malicious damage and destruction to Plaintiffs' property by conversion (§ 523(a)(6)); and Count III, that the Debtors made false statements under oath by failing to list all of their assets on their bankruptcy schedules and statements (§ 727(a)(2) and (4)). The Debtors/Defendants in their Answer deny all of the material allegations of the Complaint. The Debtors/Defendants set forth an affirmative defense that the Memorandum of Understanding settled and re-

solved all prior claims of the Bank and, therefore, any claims based on the original loan agreement have no basis to be alleged. The Bank resists the Debtors' affirmative defense based on the language of the Memorandum of Understanding that states that the Bank's rights are not nullified or waived by the Memorandum.[1] A Cross–Complaint was also filed with the Debtors' Answer. The Cross–Complaint was stricken by Order of this Court dated May 19, 1988.

■ This Court will first address the allegations contained in Count III of the Complaint. Count III of the Complaint is based on 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A). Sections 727(a)(2)(A) and (a)(4)(A) provide:

> "(a) The court shall grant the debtor a discharge unless—
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title [11 USCS §§ 101 et seq.], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition;  or
>
> \*  \*  \*  \*  \*  \*
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A) made a false oath or account:"

In order to sustain an objection to discharge under § 727(a)(2)(A), the evidence must establish: (1) That the Debtor transferred, removed, or concealed the property; (2) that such property belonged to the Debtor; (3) that the transfer, removal, or concealment occurred within one year be-

fore the Petition in Bankruptcy was filed; and (4) that the act was done with an intent to hinder, delay or defraud a creditor. *In re Martin*, 88 B.R. 319, 322 (D.Colo.1988); *In re Shumate*, 55 B.R. 489, 493 (Bankr.W. D.Va.1985). As this Court stated in *In re Maxted*, 107 B.R. 289 (Bankr.Mont.1988), quoting from *Colliers:*

> "[3]—Fraudulent Intent.
>
> Section 727(a)(2) provides that the act complained of must be done with intent to hinder, delay, or defraud a creditor, or an officer of the estate.
>
> The interpretation of the elements of 'intent to hinder, delay or defraud' on the part of a debtor that evolved under Section 14c(4) of the former Act retains significance for Code cases. This intent must be an actual intent as distinguished from constructive intent. Although the language, drawn from the Uniform Fraudulent Conveyance Act, implies that the debtor must have intent to defraud a creditor or officer of the estate, a careful reading indicates that intent to hinder or delay, even if not fraudulent, may be sufficient for a denial of discharge.
>
> Although actual intent must be shown, a finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct. This is because a debtor is unlikely to testify that the intent was fraudulent. Thus a court may look to all the surrounding facts and circumstances. A continuing pattern of wrongful behavior is one indication of fraudulent intent. Similarly, reckless indifference to the truth has been held to be the equivalent of fraud under section 727. The fact that valuable property has been gratuitously transferred raised a presumption that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge under section 727(a)(2)."  4

1. With regard to the Bank's allegations under 11 U.S.C. § 523(a)(2), this Court has followed the reasoning of *In re Houtman*, 568 F.2d 651 (9th Cir.1978), which holds that the creditor must have reasonably relied on the Debtor's false or fraudulent representations before the creditor's objection could be sustained. In this case, no

evidence of fraudulent transfers or conversions by the Debtors prior to the June 17, 1987, Memorandum of Understanding could be used against the Debtors, as the Bank knew cattle were unexplainedly missing and entered into a new agreement.

*Collier on Bankruptcy,* § 727.02[3] 15th Ed.1984.

*Collier's* definition of fraudulent intent is in line with the holding of *In re Devers,* 759 F.2d 751 (9th Cir.1985), which stated that, "fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."

The Bank asserts that in this case fraudulent intent can either be inferred from the Debtors' course of conduct or actually shown through the Debtors' failure to list numerous assets in their schedules and statements. The burden of proof is on the objecting party. Bankruptcy Rule 4005.

The Court will first address the Debtors' course of conduct in this case. The Debtors' course of conduct was directly brought before this Court during the administration of this adversary proceeding. On January 13, 1988, the Bank sent the Defendants a First Set of Interrogatories and First Request for Production. Then on March 9, 1988, the Bank filed a Motion to Compel Answers to Discovery or for Sanctions due to the Debtors' failure to Answer the Interrogatories or Requests. An Order was issued on March 9, 1988, by this Court directing the Debtors to forthwith answer the Requests and Interrogatories. A hearing was held May 17, 1988, on the Bank's Motion to Compel Discovery and for Sanctions, and at the hearing the Debtors admitted that they had not answered the Interrogatories and Requests as they had been Ordered to do. Accordingly, this Court imposed sanctions (the Debtors' Cross–Complaint was stricken) and ordered the Debtors to appear for a Rule 2004 examination within 15 days of Notice by the Bank and to produce all requested documents. The Debtors subsequently appeared for a 2004 examination on June 7, 1988, but failed to bring any documents as Ordered by this Court. Eventually, the Debtors supplied the necessary documents, but not until another Rule 2004 examination was held on June 20, 1988.

Additional facts relating to the Debtors' course of conduct in this case show that the Debtors transferred a 1978 Wilderness Camper Trailer (trailer) to their daughter within one year of their Petition without advising the Bank or listing the trailer in the schedules. The trailer was specifically listed on Exhibit "A" to the Memorandum of Understanding as security for the Bank. However, the Bank was not advised of the transfer. At trial the Debtors testified that the trailer's title was transferred to their daughter to secure a $10,000.00 personal loan that she had made to the Debtors. The Debtors' daughter testified that she always believed that the Bank was in the first security position on the trailer. In contradiction to the testimony, the Debtors' Schedule A–3, lists the daughter as a creditor having unsecured claims without priority in the undisputed amount of $10,000.00. The Bank, through extensive discovery, became aware of the transfer at one of the Rule 2004 examinations that took place nearly one year after the Debtors' Petition was filed. The Debtors testified that their attorneys advised them not to list the travel trailer. Testimony of the attorneys, however, refutes this allegation. This Court, therefore, does not find the Debtors' testimony credible. Review of the Debtors' records show that they have never amended their schedules to reflect the transfer of the trailer. Accordingly, this Court finds that the Debtors did transfer property of the estate within one year of the filing of the Petition, failed to disclose it, and that the delay in informing the creditor of the transfer is inferred as intentional in that the Debtors only disclosed the fact under examination by the Bank. Although such a finding can bar the Debtors' discharge under § 727(a)(2)(A), this Court will continue to address the Debtors' course of conduct with respect to other § 727(a)(2)(A) allegations.

The Debtors informed the Bank at a Rule 2004 meeting that they had transferred a 1030 Case Tractor, that like the trailer addressed above, was specifically listed as a secured asset of the Bank. No disclosure of the transfer was made on the Debtors' schedules or statements and the transfer occurred within one year of the filing of the Petition. The Debtors' schedules and statements listed their machinery and equipment as zero. The Debtors testified

that this was done because the Bank had a security interest in all of the machinery and equipment. The Debtors further testified that their attorneys were aware of the machinery and equipment, but advised the Debtors that it did not have to be listed. Once again, however, the testimony of the attorneys is in direct contradiction to the Debtors' testimony. The Bank, through a 2004 examination, learned that numerous items of the Debtors' machinery and equipment were being kept on the "Swant place" (this land was not the Debtors, but they had access to it regularly). After the Debtors were made aware of the fact that they did in fact have machinery and equipment, they once again did not amend any of their schedules or statements to reflect such a fact.

█ In this case, this Court finds that the evidence presented at trial shows that the Debtors/Defendants: (1) transferred two items that were given as security to the Bank without listing any reference to the transfers on their schedules; (2) did not cooperate with the Bank's discovery requests or this Court's Order regarding discovery; (3) did not list on their schedules that they had any machinery or equipment, or that some of the machinery and equipment was located on property that was not the Debtors; and (4) never amended their schedules and statements to properly reflect their asset situation. Based on this evidence and the Debtors' course of conduct, this Court finds that the Debtors intended to hinder and delay the Bank and other creditors. As such, the Debtors/Defendants are not entitled to a general discharge of their debts under § 727(a)(2)(A). Although this is dispositive of the dischargeability issue, this Court will address § 727(a)(4)(A).

█ The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely upon it without the need for the Trustee or other interested parties to dig out the true facts through examinations or investigations. *Martin*, supra, at 323; *In re Diodati*, 9 B.R. 804,

807 (Bankr.D.Mass.1981). Fraudulent intent will be imputed if non-disclosed or scheduled assets have substantial value. *In the Matter of Galbraith*, 17 B.R. 302, 305 (Bankr.M.D.Fla.1982); *In re Topping*, 84 B.R. 840, 842 (Bankr.M.D.Fla.1988). In this case, the Debtors failed to list a limited partnership interest in Las Vegas, certain equipment and machinery pledged to the Plaintiff, a receivable from the Mallard Land Company, and a receivable and guaranty from Robert Klicker. The Bank alleges that the total value of assets not listed is greater than $876,000.00. The Debtors refute the Bank's allegations of fraudulent false oath by stating that all of the assets, except the receivable from Robert Klicker, that the Bank alleges were omitted are listed in the Memorandum of Understanding signed with the Bank on June 17, 1986. Therefore, the Debtors contend that there was no fraud against the Bank because they had knowledge of the omitted assets. With respect to the Klicker receivable, the Debtors admit that "there were claims against Mallard [corporation] and that the same had been guaranteed by Mr. Klicker". Yet, in the same instance, the Debtors assert that the appropriate concern on this matter should be that the Debtors discussed the receivable with their attorney, and thereafter the matter was not put in the Debtors' schedules or statements. The attorneys which had been representing the Debtors testified that they did not tell the Debtors to omit anything from their schedules and that if they had known specifically of the omitted material they would have advised the Debtors to list it.

In order to sustain an objection to discharge under 727(a)(4)(A), the evidence must be established: (1) That the Debtor made a false oath or account in connection with his bankruptcy proceeding; and (2) that such false oath or account was knowingly and fraudulently made. *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984). The false oath or account must be related to a material fact. *In re Kessler*, 51 B.R. 895, 899 (Bankr.D.Kan.1985); *In re Bobroff*, 58 B.R. 950, 952 (Bankr.E.D.Pa.1986). A material omission from the Debtors' Chapter 7

schedules, or a false answer on a statement of financial affairs may constitute a false oath for purposes of § 727. *Martin* at 323; *Comprehensive Accounting Corp. v. Morgan*, 43 B.R. 264, 271 (Bankr.E.D.Tenn. 1984). It may be inferred from the circumstances that the Debtors acted "knowingly and fraudulently" in omitting a material fact. *In re Braidis*, 27 B.R. 470, 472 (Bankr.E.D.Pa.1983); *Bobroff*, at 953.

At trial, the Debtor/Defendants acknowledged that they had signed the financial statements and schedules "under penalty of perjury", and that the information supplied was true and correct to the best of their "knowledge, information and belief". This Court finds that the Debtors' failure to list the receivables, machinery and equipment, the transfers of property, and the partnership interest in Las Vegas, was a material omission. Furthermore, the Court finds that there is clear and convincing evidence that the Debtors acted in reckless disregard of both the serious nature of the schedules and statements and the need to disclose with detail and accuracy. In this case, the Debtors have attempted to take advantage of the Bankruptcy Code's liberal fresh start policy, yet they have not performed the requisite obligations that the Code puts on them.

The Bank's first two counts are based on § 523 of the Code. Count I and II are specifically based on § 523(a)(2)(A) and (a)(6) of the Code which state:

"(a) A discharge under section 727, 1141, 1228, 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;"

█ In this case, the Bank reasonably relied upon the Debtor's financial statements at the time that the parties entered into the Memorandum of Understanding on June 17, 1986. At that time, the Debtors informed the Bank that they did not know where any of their missing cattle were and the Debtors gave the Bank additional security interests in numerous items of collateral. At trial, evidence showed that the Debtors did in fact still have cattle at a feed lot and did not inform the Bank. The evidence further proved that the Debtors pledged several vehicles as collateral (a 1256 International tractor and a 1978 Chevrolet Suburban) that they did not own. The Debtors alleged that the vehicle ownership problem was due to the Debtors' official capacity with the corporation that was shown to own the vehicles. However, this Court finds that the Debtors did not own the two vehicles, listed the vehicles as collateral for the Bank, and either did or should have known (through their corporate affiliation) that the vehicles belonged to the corporation. Accordingly, this Court finds that the Debtors made false and fraudulent representations in order to obtain credit from the Bank in violation of § 523(a)(2)(A).

█ The evidence before the Court, as outlined above in the discussion with regard to § 727, further shows: (1) That the Debtors willfully and maliciously converted the Wilderness Camp Trailer that was security of Bank; (2) That the Debtors willfully and maliciously converted the 1030 Case tractor; and (3) that the Debtors willfully and maliciously concealed property of the estate, that was pledged to the Bank, when they did not list or disclose the whereabouts of the machinery and equipment that was located on the Swant place. Accordingly, this Court finds that the Debtors did willful and malicious injury to the property of the Bank in violation of § 523(a)(6).

IT IS ORDERED:

(1) That the Debtors/Defendants are denied a general discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A); and

(2) That the First National Bank of White Sulphur Springs shall have judgment

against the Debtors/Defendants Larry L. Bastrom and Sharla S. Bastrom in the amount of $341,871.67, together with interest at a per diem interest rate of $96.29, and that said debt is non-dischargeable under 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(6).

The Clerk shall enter judgment accordingly.