**In re Theodore H. HENDERSON, Jr., Debtor.**

**Doris APPLEBAUM, Plaintiff,**

v.

**Theodore H. HENDERSON, Jr., Defendant.**

**Bankruptcy No. 91–11021S.
Adv. No. 91–0386S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 10, 1991.

Jordon R. Pitock, Philadelphia, Pa., for debtor.

Christine C. Shubert, Tabernacle, N.J., Trustee.

Doris Applebaum, plaintiff pro se.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us is a controversy resulting from the filing of a Complaint ("the Complaint") by a creditor, DORIS APPLEBAUM, ES-QUIRE ("the Plaintiff"), appearing *pro se,* objecting to the discharge of THEODORE H. HENDERSON, JR. ("the Debtor") and the dischargeability of the Debtor's indebtedness to her. In deciding this matter, we concentrate on whether the debts are non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) or 523(a)(2)(B), or whether a discharge may be denied to the Debtor on the basis of 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B) or 727(a)(4)(A), since these are

the only Code sections referenced in the Plaintiff's voluminous post-trial Brief. We find that the Plaintiff has not proven a case by a preponderance of the evidence under any of the foregoing Bankruptcy Code sections. We therefore enter judgment in favor of the Debtor.

## B. PROCEDURAL HISTORY

On February 6, 1991, the Debtor filed a voluntary petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code. An Order dated March 6, 1991, was entered which scheduled the First Meeting of Creditors, pursuant to 11 U.S.C. § 341(a) ("the Meeting"), on April 5, 1991, and set June 4, 1991, as the deadline for the filing of any complaints in opposition to the discharge of the Debtor. The Meeting was held on April 11, 1991. The Plaintiff filed the Complaint on June 3, 1991.

On April 19, 1991, the Plaintiff filed a Motion for a Bankruptcy Rule ("B. Rule") 2004 Examination (a "2004 Exam.") of the Debtor, followed by the filing of an Amended Motion ten (10) days later. This court entered an Order dated May 16, 1991, granting the Plaintiff's Amended Motion and allowed the 2004 Exam. to be conducted at a date and time to be arranged on or before May 31, 1991. On May 24, 1991, the date chosen by Plaintiff for the 2004 Exam. when she failed to receive a response from the Debtor or his counsel, Jordon R. Pitock, Esquire ("Pitock"), regarding its scheduling, neither the Debtor nor Pitock appeared. The Plaintiff then filed a Motion to Adjudicate the Debtor to be in Contempt of Court's Order of May 16, 1991, and for Sanctions Including Dismissal of the Case ("Contempt Motion I").

A hearing of June 25, 1991, was scheduled as to Contempt Motion I. At the hearing, only the Debtor appeared. After a colloquy with the Plaintiff and the Debtor, we entered an Order which (1) rescheduled the hearing on Contempt Motion I for July 16, 1991; (2) required both the Debtor and Pitock to appear for a 2004 Exam. at the Plaintiff's office on July 12, 1991, at 9:00 a.m.; (3) noted and rejected Pitock's unilateral attempt to withdraw as the Debt-

or's counsel, in contravention of Local Bankruptcy Rule 9010.1(d); and (4) directed Pitock "to appear at the said hearing and trial [of this proceeding], represent the Debtor to the best of his ability, and show cause why some or all of the fees paid or payable to him ... should not be refunded."

The Debtor (but not Pitock) did attend the 2004 Exam. scheduled for July 12, 1991. The Debtor, according to the Plaintiff, failed to provide the complete multitude of documents requested by her to be produced. A lengthy hearing of July 16, 1991, on Contempt Motion I ensued. We concluded that the Debtor had unjustifiably failed to attend the Examination in May; had, however, been examined for a full day on July 12, 1991; had produced many relevant documents at the 2004 Exam.; and therefore that any further Examination would constitute abuse or harassment of the Debtor. *See In re Hammond,* 131 B.R. 78 (Bankr.S.D.Ohio 1991). In an Order of July 18, 1991, we directed the Debtor to pay, as an administrative expense, $150.00 to the Plaintiff for his failure to attend the May 24, 1991, 2004 Exam. and directed him to supply but one additional document to the Plaintiff. Also, after clearing the date with the Plaintiff and Pitock, we scheduled the trial of the adversary proceeding on a must-be-tried basis on September 17, 1991. Finally, we denied all other relief requested by the Plaintiff, including dismissal of the bankruptcy case underlying this adversary proceeding, and noted that

> [o]ur Order is further tempered by our finding that, while the Debtor's good faith in cooperating with [the Plaintiff's] request (and our Orders) is suspect, we also question [the Plaintiff's] good faith in her filings, as she appears to be motivated by vindictiveness towards the Debtor which have caused her to apply excessive resources ... in pursuit of the Debtor.

On July 19, 1991, the Plaintiff filed a Praecipe seeking the entry of a default against the Debtor in light of his failure to file an Answer to the Complaint. How-

ever, we clearly observed that the Debtor wished to defend this action, and that, despite our Order of June 25, 1991, Pitock had done little or nothing to represent the Debtor's interests. Therefore, we perceived that, in essence, the Debtor was defending himself *pro se* against the onslaughts of an overzealous Plaintiff.

On August 2, 1991, Pitock filed a formal Motion to withdraw as the Debtor's counsel, alleging that the Plaintiff's numerous filings and the Debtor's failure to pay more than $400, against $300 expended by him in costs, had placed "undue hardship" upon him. The Debtor opposed Pitock's motion.

On August 13, 1991, the Plaintiff filed a Motion for Default Judgment against the Debtor in light of his failure to answer the Complaint. And, on August 29, 1991, the Plaintiff filed a Motion for Sanctions ("Contempt Motion II"), due to the Debtor's failure to answer certain additional discovery requests. Expedited treatment of Contempt Motion II was not sought, and it was was consequently scheduled for a hearing on October 1, 1991.

On September 3, 1991, after a hearing on same, we denied Pitock's Motion to withdraw as counsel. *See Ohntrup v. Firearms Center, Inc.*, 802 F.2d 676, 679–80 (3d Cir.1986) (counsel not permitted to withdraw if effective administration of the judicial system is served by disallowing withdrawal); *In re Meyers*, 120 B.R. 751, 752 (Bankr.S.D.N.Y.1990) (unanticipated challenge to debtor's discharge does not justify withdrawal by debtor's counsel); and *In re Edsall*, 89 B.R. 772 (Bankr.N.D.Ind.1988) (debtor's non-payment of fees does not justify withdrawal by debtor's counsel).

On September 17, 1991, trial of the Complaint was begun. Pitock participated in body, but with little spirit. The proceedings were halted, after several hours, due to a religious holiday of Pitock.

On this first day of the testimony, the Plaintiff presented twelve witnesses, subpoenaed by her to court, who testified, essentially, regarding the Debtor's businesses, Livery Services, Inc. ("Livery") and Mortuary Removal Service, Inc. ("MRS"). The hearing was continued by agreement

to October 17, 1991. On October 1, 1991, we conducted a hearing on Contempt Motion II, although observing that it was inappropriate to be hearing a discovery motion after the trial had begun. In an Order of October 2, 1991, we directed the Debtor to provide to the Plaintiff, on or before October 11, 1991, the names, addresses, and telephone numbers, and a summary of expected testimony of all persons he expected to call as witnesses on October 17, 1991, and denied all other relief requested in Contempt Motion II. As it developed, the Debtor never responded to this Order, but called no witnesses other than himself.

An associate of Pitock, who knew virtually nothing about the case, appeared to "defend" the Debtor on October 17, 1991. Most of the testimony this date was from the Plaintiff herself. After her lengthy testimony, prompting little cross-examination, the Debtor briefly took the stand. By Order of this court dated October 21, 1991, we directed the Plaintiff and the Debtor to file proposed Findings of Fact, proposed Conclusions of Law, and/or Briefs, on or before November 8, 1991, and November 18, 1991, respectively. Sensing that Pitock would file nothing, we allowed the Debtor to file a less formal submission *pro se.* The Plaintiff timely filed a 63–page *opus.* The Debtor submitted a *pro se* offering which concentrated on the facts which he and the Plaintiff disputed.

## C. FACTUAL HISTORY

We are describing the facts in narrative form because it is our belief that there are virtually no disputed facts which are material to our disposition. All testimony heard on September 17, 1991, essentially merely supplemented that presented on October 17, 1991, by the Plaintiff, and shall be summarized, where relevant, at pages 153–55 *infra,* following a consideration of the more relevant testimony of the Plaintiff, and prior to a summary of the Debtor's testimony.

The Debtor's principal occupation is as an Episcopalian priest. He was hired in this role on a part-time basis for the Memorial Church of St. Paul, Overbrook in Phila-

delphia, Pennsylvania ("the Church") in 1988. As compensation and benefits, the Debtor received a cash salary, hospital and life insurance, a pension fund, a housing allowance, a travel allowance, and a discretionary fund. Sometime in October, 1990, the Debtor was, for undisclosed reasons, dismissed from his position with the Church by Bishop Bartlett, an agent of Philadelphia Diocese of the Episcopal Church who had, apparently, ecclesiastical authority to take such action. Despite his dismissal, the Debtor continued to receive a monthly housing allowance of $1,000.00 from the Church until March, 1991.

Besides his priesthood, the Debtor was also involved in two businesses unrelated to his ministry, Livery and MRS. The Debtor was president of Livery, a corporate enterprise which provided limousine services for primarily employees of Johnson and Johnson Co. and its subsidiaries. In December, 1990, Pitock filed a bankruptcy petition for Livery. However, the case was subsequently dismissed because the requisite Schedules and Statements were not filed. MRS was originally the fictitious name of a business of which the Debtor was proprietor which was involved in obtaining unclaimed dead bodies and selling them for research purposes. MRS was incorporated in January, 1990. Thomas M. Whelans, Jr., whose role is more thoroughly described at page 154 *infra,* and the Debtor were its incorporators. A bank account for MRS was not opened until on or about August 16, 1991, with Livery's funds. The Debtor testified that concern about transmission of AIDS had hurt MRS's business. It no longer exists and the bank account was closed two weeks before the September 17, 1991, hearing date.

The Plaintiff testified that she began representing the Debtor in or about 1980 and first executed a fee agreement with the Debtor on September 26, 1983 ("Fee Agreement I"). In Fee Agreement I, the Plaintiff sought to have the Debtor accept individual responsibility, along with Livery's corporate responsibility, for payment of her counsel fees, which mainly resulted from the Plaintiff's representation of Livery before the Pennsylvania Public Utility Commission. The Plaintiff, however, declined to commit his individual responsibility for the fees, and only Livery was liable for the fees under Fee Agreement I. The Debtor paid the fees, on behalf of Livery, by making payments directly into the Plaintiff's checking account.

The Plaintiff testified that, in late October, 1984, the Debtor sought her legal advice in reference to a condominium unit he intended to buy, located at 236 Glen Place, Elkins Park, Pennsylvania 19117 ("the Realty"). Because he had no record of an individual income or checking account and his mother, Millicent Cameron Gibbs ("the Mother"), who resided in South Carolina, had always sent him checks when he needed money, the Debtor was unable to secure a mortgage. Since the funds for the down payment also came from the Mother, it was decided that the Mother would apply for the mortgage and that the property would be deeded to her. The coupons for the mortgage payments were initially sent to the Mother, and later directly to the Debtor, who made all of the payments.

The Plaintiff testified that, around the same time that settlement occurred on the Realty, the Debtor requested that she prepare a power of attorney in herself regarding the Realty. A "substitute" power of attorney was also prepared, which would have placed the power in the Debtor. The Mother executed the power in the Plaintiff's favor, but it is not clear whether she executed that in favor of the Debtor.

On or about January 21, 1985, the Mother suffered a massive stroke from which she was not expected to survive. The Plaintiff testified that, because the Debtor did not wish the Realty to pass through the Mother's estate, he requested the Plaintiff to exercise her power of attorney and have the Realty transferred to his daughter, Jill Elizabeth Henderson ("Jill"). The Plaintiff also had a power of attorney from Jill prepared, similar to the one she had received for the Debtor's mother. Again, Jill executed the power in favor of the Plaintiff, but it is not clear whether she executed that in favor of the Debtor also.

Subsequently, the Debtor continued, since the date of settlement, to reside in the property, to pay the mortgage, to pay the condominium fees, to pay all utilities associated therewith, and to have all dominion and control over the property. The Plaintiff stated that, after the transfer of title to her, Jill returned to Delaware, where she lived, and visited her father infrequently.

In February, 1985, Fee Agreement I had an outstanding balance of approximately $14,000.00. On February 1, 1985, the Plaintiff sent the Debtor an updated statement listing a balance of $25,735.15 for legal services. A new payment agreement and security agreement ("Fee Agreement II") was sent with the updated statement, and covered this outstanding indebtedness. Fee Agreement II was signed by the Debtor, in his individual capacity and in his capacity as president of Livery. A judgment note in favor of the Plaintiff in the amount of $15,735.35 was also signed by Jill.

In or about May, 1985, the Plaintiff prepared a demand note and a voluntary confession of judgment for Jill, along with a new revised bill of $13,814.38. The demand note and voluntary confession were never executed. On or about May 1, 1986, the Plaintiff prepared another demand note and voluntary confession of judgment for Jill. By that time, Jill and the Debtor had become estranged. Soon after, upon receiving the Debtor's consent, the Plaintiff exercised her power of attorney and executed the demand note and voluntary confession of judgment, thereby obtaining a judgment and lien against the Realty in the amount of $8,068.25.

On June 1, 1987, as stated in the Complaint, the Plaintiff alleged that she entered into a written contract ("the Contract") with the Debtor in his individual capacity and as president of Livery, whereby the Plaintiff would provide future legal services to Livery. The Contract treats Livery and the Debtor as one entity. In exchange for such services and for services performed from September 1, 1986, to June 1, 1987, Livery covenanted to pay the Plaintiff $800.00 per month. Also, Livery covenanted that it owed the Plaintiff an indebtedness of at least $8,068.25. The amount of the indebtedness was to be secured by a lien held by the Plaintiff against the Realty. The Contract stated that Livery was the equitable owner of the Realty and would take no action to prevent the Plaintiff from entering a lien against the Realty.

On or about August 5, 1988, in a telephone conversation with the Debtor, the Plaintiff asked and received the Debtor's consent to enter another confessed judgment against Jill in the amount of $67,-480.74. The Plaintiff again exercised her power of attorney for Jill and confessed a judgment in this amount on September 2, 1988.

In or about June or July, 1989, Jill began to dispute the efficacy of the judgments entered against her. Jill instituted proceedings to strike the judgments, which prompted the Plaintiff to attempt garnishment against Jill and the Mother. Later, by agreement between Jill and the Plaintiff, the judgments against Jill were stricken. As of the date of the October 17, 1991, hearing, the Plaintiff stated that she had obtained a judgment in garnishment only against the Mother. The Plaintiff is awaiting trial on her garnishment proceeding against Jill. Since both of these proceedings only seek to garnish property in aid of the Plaintiff's claim against the Debtor, the outcome of these proceedings is dependent on whether the Debtor's indebtednesses to the Plaintiff are dischargeable.

On August 7, 1990, the Plaintiff executed against Livery's bank account for payment of the fees under the Contract. A few payments were received. On October 17, 1990, Livery filed for bankruptcy. Livery listed total assets of $13,000.00. The Debtor filed for bankruptcy on February, 1991, and did not list Livery's assets on his Schedules.

The relevant testimony of several of the non-party witnesses is as follows. Thomas N. Smith, the president of Genesis Leasing Corp. ("Genesis"), testified as to lease arrangements for limousines leased by Livery, which continue to date. The lease agreements were guaranteed by the Debt-

or. At the end of the lease periods, as to two of the limousines, one of them (a 1982 Cadillac hearse) was transferred to Memphis Coach Co. by Genesis, while the other (a 1984 Cadillac sedan) was purchased by Livery. The Debtor stated in his testimony that the 1984 Cadillac sedan was presently titled in the name of MRS. Smith stated that Genesis also leased a 1989 Lincoln Town Car stretch limousine ("the Lincoln") jointly to Livery and the Church in December, 1989, which the Debtor also guaranteed. Smith stated that he was uncertain from whom the payments came for the 1984 and 1982 Cadillacs and for the current lease of the Lincoln.

Martin Kalos, a shareholder in the accounting firm of Schwartz, Carson and Co., testified that Livery and the Debtor were his firm's clients. Kalos testified that, on his personal income tax returns, the Debtor had indicated income from his employment as a minister and from employment with Livery. He also noted that the 1989 tax worksheets for Livery indicated that proceeds from the sale of certain vehicles were used to pay for the incorporation of MRS and that there were entries for payments on certain motor vehicles.

Frances Jackson testified as records custodian of First Pennsylvania Bank ("First Pennsylvania"). She stated that MRS opened an account with First Pennsylvania on or about August 16, 1990, and that the two signatories to the account were Mildred H. Whitehead, president and vice-president, and Whelans, secretary. Jackson produced what appear to be every cancelled check and deposit slip in reference to the account, all of which were signed by Whitehead or Whelans.

Leroy Mundy, III, the owner of Fluehr Funeral Home, testified that he currently employed the Debtor as an assistant to the funeral director who performs largely office/administrative duties.

Whelans identified himself as an accountant and the owner of an unrelated business. He testified he was not an accountant for MRS, Livery, or for the Debtor, although he did incorporate and apply for a tax identification number for MRS. He stated that he had signed checks for MRS, at the Debtor's direction, "in blank." Whelans maintained that he had little to do with MRS and stated that he had formed it for the Debtor. He also stated that MRS no longer exists, as of approximately two weeks before the hearing, and that its bank account with First Pennsylvania has been closed.

Whitehead, a former intimate acquaintance of the Debtor for approximately two years, testified largely to her role as signatory for MRS. She testified that the title of the MRS account with First Pennsylvania had printed by the Debtor. She also stated that she, like Whelans, had signed numerous blank checks within checkbooks provided by the Debtor. She identified the handwriting designating the various respective payees as that of the Debtor.

Robert A. Seifert, employed as a part-time chauffeur/driver, primarily for Livery, since February, 1991, testified briefly regarding the present business of Livery, as a provider of limousine services for several businesses, including Johnson and Johnson and its subsidiaries. Seifert stated that Livery was paid in cash for its services, and that he gave the cash to the Debtor. He testified that business had declined from about three trips weekly to he airport to two trips monthly. He stated that two vehicles, the Lincoln and a 1977 Cadillac hearse, are presently used in this business.

Alice Chesterman testified that she had formerly been the "rector's warden" at the Church. She acknowledged that the Church, via the decision of the vestry, had entered into a Lease Agreement for the Lincoln in order to transport elderly church members to and from the Church, but, since the closing of the Church, the vehicle is no longer needed for that purpose.

Louis C. Rosen, Esquire, testified that he was retained to represent the vestry in a legal dispute between Bishop Bartlett and the Debtor, which was subsequently dismissed in the Philadelphia Court of Common Pleas. He verified that the Bishop had not explained his actions against the Debtor. He also confirmed the salary and

benefits of the Debtor during his tenure as the Church's priest.

William A. Powell, controller of the Episcopal Diocese of Pennsylvania, testified on October 17, 1991, and confirmed the Debtor's salary and benefits in 1990, 1989, and 1988, as totalling $27,675.00, $19,758.00 and $33,497.00, respectively, which he considered normal for someone in the Debtor's capacity. Powell stated that the Church's audit records did not list the Church as a lessee of the Lincoln, but that Chesterman did sign her name for the vestry as a lessee of the vehicle.

The Debtor testified that he conceived the mortgage payments which he made on the Realty to be like "rental" payments to his mother and, later, to Jill. As to the Lincoln, the Debtor testified that he believed that the Lincoln was titled to the Church and that there was an agreement between him and the Church that the latter would "purchase the lease" and that he would guarantee the lease. Further, the Debtor identified MRS as a former unincorporated business which he had operated under a fictitious name for some time prior to his establishing this business. He stated that he intended it to be a corporate entity for Whitehead to purchase once it had been established. However, since his relationship with Whitehead had ended, the business had been "scuttled." He stated that he employed Seifert to do a minimal amount of work.

On cross-examination, with respect to the Lincoln, the Debtor identified himself as a guarantor, a maker of past payments, and a user, but not an owner. He stated that he believed that, at the end of the lease, either he or the Church would have the right to exercise the "buy-out" option.

The Debtor stated that he had not exercised one of the "buy-out" options for either the 1982 and 1984 Cadillacs and confirmed that the 1982 Cadillac hearse was sold by Genesis to Memphis Coach Co. He stated that the 1984 Cadillac was purchased by Livery, although it was titled in the name of MRS. Finally, he testified that the First Pennsylvania account contained funds generated from Livery.

## D. CONCLUSIONS OF LAW DISCUSSION

### 1. General Observations

We begin by noting that all controversies concerning the dischargeability of a debt are core proceedings, pursuant to 28 U.S.C. § 157(b)(2)(I), and therefore a bankruptcy court must hear and determine such matters.

The Complaint ambitiously purports to seek relief under possibly all sections of §§ 523(a)(2) and 727(a). However, our focus is narrowed considerably by the Plaintiff's failure to argue, or even mention, in her voluminous post-trial Brief, any subsections of §§ 523(a) or 727(a) other than 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 727(a)(2)(A), 727(a)(2)(B), and 727(a)(4)(A). We find that the Plaintiff's failure to argue the applicability of the remaining subsections of §§ 523(a)(2) and 727(a) in her post-trial Brief results in abandonment of any such claims and, hence, their removal from the court's consideration. *See Universe Tankships, Inc. v. United States,* 528 F.2d 73, 74–76, 77 (3rd Cir.1975); and *In re Slawek, Slawek v. Turmel,* 1990 WEST-LAW 41877, slip op. at 7 (Bankr.E.D.Pa. April 6, 1990), *recommendation adopted,* 1990 WESTLAW 99276 (E.D.Pa. July 12, 1990).

The subsections of the Code remaining at issue provide as follows:

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, … of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

## § 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; ...

. . . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; ...

■ In *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991), the United States Supreme Court held that "preponderance of the evidence" was the applicable standard of proof which a plaintiff must meet to succeed in an action brought under § 523(a). Based upon the Court's analysis in *Grogan*, this court finds that this same standard should also be applicable to a plaintiff in an action challenging a debtor's siccharge under § 727(a). *Accord, In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.1991); *In re Sumpter*, Bankr. No. 89–09791, Adv. No. 89–9090, 1991 WL 316912, at *2 1991 Bankr.LEXIS 1001, slip op. at *7 (Bankr.E.D.Mich. July 9, 1991); *In re Cook*, 126 B.R. 261, 265–66 (Bankr.E.D.Tex.1991); and *In re Goldstein*, 123 B.R. 514, 522 n. 15 (Bankr. E.D.Pa.1991). As is stated in *Burch v. Reading Co.*, 240 F.2d 574, 579 (3d Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), when the standard of

proof is the "preponderance of the evidence,"

the plaintiff's burden is to convince [the factfinder] upon all the evidence before [it] that the facts asserted by the plaintiff are more probably true than false ... [the factfinder] must at least be convinced that the evidence considered as a whole, its "preponderance" to use the traditional term, indicates that the facts asserted by the plaintiff are probably true.

### 2. 11 U.S.C. § 727(a)(2)

■ As we noted in *Goldstein, supra*, 123 B.R. at 522, and as is consistently reflected in case law in this jurisdiction, objections to discharge are construed strictly against the objector and in favor of the debtor. *See In re Leichter*, 197 F.2d 955, 959 (3rd Cir.1952), *cert. denied sub nom. Dworsky v. Leichter*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); *In re Latimer*, 82 B.R. 354, 359 (Bankr.E.D.Pa.1988); *In re Garcia*, 88 B.R. 695, 702 (Bankr.E.D.Pa. 1988); *In re Somerville*, 73 B.R. 826, 833 (Bankr.E.D.Pa.1987); and *In re Woerner*, 66 B.R. 964, 971 (Bankr.E.D.Pa.1986), *aff'd*, C.A. 86–7324 (E.D.Pa. April 28, 1987). Such treatment reflects this court's recognition that "[p]ublic policy requires that objections to discharge not be easily granted." *Somerville, supra*, 73 B.R. at 833, citing *Woerner, supra*, 66 B.R. at 971.

To succeed in her cause of action based upon either prong of § 727(a)(2), the Plaintiff must prove, by a preponderance of the evidence that there has been (1) a transfer, removal, destruction, mutilation, or concealment, (2) involving property of (a) the debtor, one year prior to the filing of the petition or (b) the estate, after the filing, (3) whereby the debtor intends to hinder, delay, or defraud a creditor. *In re Bernat*, 57 B.R. 1009, 1012 (E.D.Pa.1986). *See also In re Chastant*, 873 F.2d 89, 90–91 (5th Cir.1989); *Latimer, supra*, 82 B.R. at 360; and *In re Schultz*, 71 B.R. 711, 715 (Bankr. E.D.Pa.1987).

■ Critical to such a cause of action is the Plaintiff's proof that the Debtor possessed the actual intent to hinder, delay, or defraud his creditors. *In re Carey*, 938 F.2d 1073, 1077 (10th Cir.1991); *In re Mor-*

*eno,* 892 F.2d 417, 419–20 (5th Cir.1990); *Chastant, supra,* 873 F.2d at 91; *Lovell v. Mixon,* 719 F.2d 1373, 1376–77 (8th Cir. 1983); *In re Overmyer,* 121 B.R. 272, 281 (Bankr.S.D.N.Y.1990); *In re Hubbard,* 96 B.R. 739, 741 (Bankr.W.D.Tex.1989); *Somerville, supra,* 73 B.R. at 834; and *In re Bacher,* 47 B.R. 825, 828 (Bankr.E.D.Pa. 1985). Proof of actual intent, as opposed to constructive intent, to hinder, delay, or defraud a creditor is essential. *See In re Devers,* 759 F.2d 751, 753 (9th Cir.1985); *Lovell, supra,* 719 F.2d at 1376–77; *In re Glaser,* 49 B.R. 1015, 1019 (S.D.N.Y.1985); *Overmyer, supra,* 121 B.R. at 281; and *In re Graham,* 111 B.R. 801, 805 (Bankr. E.D.Ark.1990). However, actual intent may be proven by circumstantial evidence. *Chastant, supra,* 873 F.2d at 91; *Devers, supra,* 759 F.2d at 754; *Bernat, supra,* 57 B.R. at 1012; *Graham, supra,* 111 B.R. at 805; and *In re Topping,* 84 B.R. 840, 842 (Bankr.M.D.Fla.1988). The requisite intent may also be found where there is proof that the debtor "gratuitously transfers valuable property or transfers property for inadequate consideration, when pressed by creditors." *Somerville, supra,* 73 B.R. at 834. *See also In re Ingersoll,* 124 B.R. 116, 121 (M.D.Fla.1991); *In re Ford,* 53 B.R. 444, 449 (W.D.Va.1984); *Bacher, supra,* 47 B.R. at 828; and *In re Rubin,* 12 B.R. 436, 481 (Bankr.S.D.N.Y.1981). Such intent will also be found when the debtor gratuitously transfers property within one year of the bankruptcy filing. *See In re Locke,* 50 B.R. 443, 452 (Bankr.E.D.Ark. 1985); and *In re O'Connor,* 32 B.R. 626, 628 (Bankr.E.D.Pa.1983). Furthermore, several cases have held that the omission of numerous and/or significant assets is a sufficient basis for denial of discharge. *In re Kindorf,* 105 B.R. 685, 689 (Bankr. M.D.Fla.1989); *Garcia, supra,* 88 B.R. at 706; and *Topping, supra,* 84 B.R. at 842.

█ Although the Plaintiff has not articulated her § 727(a)(2) claims in these terms, it appears that she is alleging that the Debtor has endeavored to conceal property belonging to him or the estate. Where concealment of property is in issue, the Third Circuit Court of Appeals has "defined concealment to include preventing the discovery of or the withholding of knowledge of the property." *United States v. Schireson,* 116 F.2d 881, 884 (3d Cir.1940). *See also Bernat, supra,* 57 B.R. at 1012. Even where concealment of property has occurred outside of the one year period stated in § 727(a)(2)(A), concealment may nevertheless be at issue, under that Code section, where there is a finding that the debtor has engaged in continuing concealment of property. *See In re Cook,* 126 B.R. at 266, quoting *In re Olivier,* 819 F.2d 550, 555 (5th Cir.1987).

█ The two common characteristics of cases involving the continual concealment of property doctrine are (1) the "transfer" of property by a debtor who, despite the transfer, retains a beneficial, or equitable, interest in the property; and (2) the debtor continues to treat the property in the same manner as before the alleged transfer. *See Olivier, supra,* 819 F.2d at 554; *In re Kauffman,* 675 F.2d 127, 128 (7th Cir. 1981); *Cook, supra,* 126 B.R. at 267; and *In re Hodge,* 92 B.R. 919, 922–23 (Bankr. D.Kan.1988).

█ Where property is transferred in an effort to hinder creditors, proof must be garnered as to the value of the property, since it must be shown

that there was an actual transfer of *valuable property* belonging to the debtor *which reduced the assets available to creditors and which was made with a fraudulent intent.*

*Somerville,* 73 B.R. at 834, quoting 4 COLLIER ON BANKRUPTCY, ¶ 727.02, at 727–20 to 727–22 (15th ed. 1984) (emphasis added and citations omitted in *Somerville* ). *See also Bacher,* 47 B.R. at 828; and *Rubin, supra,* 12 B.R. at 436, 441.

█ Based upon the above legal background, we note that the Plaintiff averred in the Complaint that, after anticipatory breach of the Contract by the Debtor, she entered the second confession of judgment for $67,480.74. When the Plaintiff attempted to execute against the judgment, the Plaintiff alleged that the Debtor denied having any ownership interest in the Realty. Further, she averred that he "caused"

his daughter and mother, referenced as the "previous" legal title owners, to file petitions "to open Plaintiff's judgment obtained against them as Garnishees." From these acts, the Plaintiff averred that the Debtor's financial condition, as represented in the Contract, was "materially false," and that "at the time of delivery of [the] written financial statement and agreement, [the Debtor] knew it was false and made with intent to deceive the Plaintiff."

We find that the Plaintiff has not carried her burden of proof. Although she did provide evidence of a transfer of assets without consideration from Livery to MRS, this evidence is not relevant to the controversy before us, since neither corporate entity, nor their respective assets, can be termed property of the Debtor or his estate. As to the Realty, we note that the evidence before the court indicates that the Debtor never had a legal interest in the entity, nor did he have ownership of the assets which were utilized to purchase the Realty. The Plaintiff's testimony plainly states that the monies to buy the Realty came from the Mother, who also was the mortgagor of, and the holder of the deed of, the Realty. Plaintiff did prove that a transfer of the Realty, without consideration, occurred between the Mother and Jill. Any interest of the Debtor in the Realty was not involved in this transaction because, although he lives and maintains the Realty, he has never been the owner of the Realty.

An argument can be made, based upon the Debtor's purported beneficial interest in the Realty, that the continuing concealment doctrine is applicable. However, the Plaintiff's testimony indicates that she was a willing and knowledgeable participant in all of the transfers which placed the ownership of the Realty in its present status, as the attorney who represented the Debtor in this transaction. In fact, based upon her knowledge of the underlying transactions and the rights which she herself was given, she was able to confess judgments which became liens against the Realty on two occasions. We find it difficult to believe that the transfers involving the Realty, with which she was intimately familiar,

could have in any sense fooled her, and hence could be said to have actually hindered, delayed, or defrauded the Plaintiff.

With respect to the various vehicles, the Plaintiff apparently intends to establish, by circumstantial evidence, specifically concerning the transfers of Livery's assets to MRS, that the Debtor's conduct manifested actual intent to defraud her, violative of § 727(a)(2). However, she provided no proof of any type of a gratuitous transfer of the *Debtor's* or *his* estate's property, nor did she prove any course of conduct with respect to the vehicles which could lead to an inference of a violation of § 727(a)(2). We also find, therefore, that the Plaintiff failed to prove the Debtor manifested any actual intent to hinder, delay, or defraud her with respect to his transfers of the vehicles.

In her Brief, with respect to her claim under § 727(a)(2), the Plaintiff relies heavily on *In re Bastrom*, 106 B.R. 223 (Bankr. D.Mont.1989). However, the facts of *Bastrom* are easily distinguishable from those of the instant case. In *Bastrom*, the debtors and defendant-bank had entered into a loan agreement for the debtor to borrow $500,000.00, in order to purchase cattle feed and operate a "feed lot." 106 B.R. at 223. The security given by the debtors for the loan was a security interest in the debtors' livestock and feed and certain certificates of deposits. *Id.* at 224. After several advances, the debtors notified the bank that the "cattle were gone and that some of the proceeds had been transferred to commodity trading accounts." *Id.* The debtors and the bank subsequently entered into an agreement whereby the debtors agreed to liquidate their holdings and remit all proceeds to the bank in order to repay the indebtedness owed to the bank. *Id.* Because it believed that the debtors' liquidation was not being done quickly enough, the bank tried unsuccessfully to repossess farm machinery, vehicles, and equipment. *Id.* The debtors filed for bankruptcy relief. The bank filed an action to deny dischargeability, alleging that the debtors had "made false statements under oath by failing to

list all of their assets on their bankruptcy schedules and statements." *Id.*

As in the instant factual pattern, the debtors failed to appear at an initial 2004 Exam. *Id.* at 226. The debtors finally did appear at second and third 2004 Exams. and produced the documents requested by the bank. *Id.* From these documents, it was discovered that the debtors had transferred a trailer to their daughter which was to be transferred to the bank. The trailer was not listed on the debtors' Schedules. *Id.* At one of the 2004 Exams, the debtors disclosed that a tractor, which was also to be transferred to the bank per their agreement, was not listed on their Schedules. *Id.* Further, the bank discovered that numerous pieces of farm machinery and equipment belonging to the debtors were located on land to which the debtors regularly had access. *Id.* at 227. This machinery and equipment also were not listed on the debtors' Schedules and Statements. *Id.*

Furthermore, as to all of these items, even following their "discovery," the debtors failed to file amended Schedules or Statements to reflect their asset situation. *Id.* at 226–27. Based on the above, the bankruptcy court found that the debtors' failure to list the items in question was a material omission, and that the debtors had acted in "reckless disregard of both the serious nature of the schedules and statements and the need to disclose with detail and accuracy." *Id.* at 228. On these bases, the court denied discharge to the debtors pursuant to § 727(a)(2)(A).

We do not find any comparable bases for application of § 727(a)(2) as a ground to justify denial of the Debtor's discharge, since it is unlikely that the Debtor could have transferred any asset of his estate without the knowledge of the Plaintiff. Any transfers between MRS and Livery do not, in our view, serve as examples of a fraudulent or otherwise deceptive courses of conduct. In *Bastrom,* the bank, unlike the instant Plaintiff, was not a party to any of the transfers made by the debtors which were not listed on the Schedules and Statements. As reflected in Debtor's Statement and Schedules and not disproved by any evidence at trial, there was not any property of the Debtor or of his estate, as opposed to property of Livery or MRS, which was transferred. We therefore conclude that no relief to the Plaintiff is warranted under § 727(a)(2).

### 3. 11 U.S.C. § 727(a)(4)(A)

We next turn to the Plaintiff's claims under § 727(a)(4)(A). From the relevant evidence before the court, and despite the exclusively-vigorous advocacy of the Plaintiff on her own behalf, we do not find, by a preponderance of the evidence, that the Debtor abrogated the strictures of § 727(a)(4)(A).

 We are cognizant of case law which imposes affirmative duties upon a debtor to disclose the existence of all assets and his ownership interests in property and to answer all questions fully and honestly for the benefit of his creditors and other parties with an interest in the proper administration of the debtor's bankruptcy case who are entitled to a " 'truthful statement' of the debtor's financial condition." *In re Arcuri,* 116 B.R. 873, 879–80 (Bankr. S.D.N.Y.1990). *See also* cases cited therein; and *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984); *In re Braymer,* 126 B.R. 499, 502 (Bankr.N.D.Tex.1991); *In re Van Den Heuvel,* 125 B.R. 846, 851 (Bankr. S.D.Fla.1991); and *In re Lunday,* 100 B.R. 502, 507–08 (Bankr.D.N.D.1989). The Debtor must therefore be denied a discharge under 11 U.S.C. § 727(a)(4)(A) if and only if it is proven, by a preponderance of the evidence, that the Debtor knowingly and fraudulently made a false oath, or statement, in, or in connection with, his bankruptcy case. *Ingersoll, supra,* 124 B.R. 116, 121 (M.D.Fla.1991); *Arcuri, supra,* 116 B.R. at 879; *Somerville, supra,* 73 B.R. at 835; and *In re Braidis,* 27 B.R. 470, 472 (Bankr.E.D.Pa.1983). Courts have held that omission of assets resulting from the debtor's reckless disregard for the truth is equivalent to fraud under § 727(a)(4)(A). *In re Tully,* 818 F.2d 106, 111 (1st Cir.1987); *In re Kaiser,* 722 F.2d 1574, 1583 (2nd Cir.1983), *In re Steiker,*

380 F.2d 765, 768 (3rd Cir.1967); *In re Calder*, 93 B.R. 734, 736 (Bankr.D.Utah 1988); and *Ingersoll, supra,* 124 B.R. at 123. However, proof of the Debtor's "[m]ere failure to disclose, without more, is insufficient to establish the requisite intent." *Garcia, supra,* 88 B.R. at 705. *See* cases cited therein; and *Woerner, supra,* 66 B.R. at 973.

Not only must the false oath or statement be knowingly and fraudulently made, but it must be material to the course of the bankruptcy case. *See Swicegood v. Ginn,* 924 F.2d 230, 232 (11th Cir.1991); *In re Olson,* 916 F.2d 481, 484 (8th Cir.1990); *Steiker, supra,* 380 F.2d at 768; *Latimer, supra,* 82 B.R. at 354; *Somerville, supra,* 73 B.R. at 835; and *Woerner, supra,* 66 B.R. at 971–76. A false oath or statement is considered "material" for the purposes of § 727(a)(4)(A) if it concerns discovery of assets, business transactions, and/or past business dealings of the debtor or the existence or disposition of the debtor's property. *In re Calder,* 907 F.2d 953, 955 (10th Cir. 1990), citing *Chalik, supra,* 748 F.2d at 618; *Steiker, supra,* 380 F.2d at 768; *Ingersoll, supra,* 124 B.R. at 123; *In re Magnuson,* 113 B.R. 555, 558 (Bankr. D.N.D.1989); *In re Harlow,* 107 B.R. 528, 531 (Bankr.W.D.Va.1989); and *Woerner, supra,* 66 B.R. at 972.

In her Complaint, the Plaintiff avers that the Debtor has given false testimony under oath and has "been unable to explain the disappearance of substantial assets in this case, including, but not limited to, several Cadillac and Lincoln limousines" used by Livery. These averments have not been substantiated by a preponderance of the evidence. The testimony before the court established that the limousines were assets of Livery and MRS, and that the Debtor merely used them, paid rent on them, and guaranteed their lease agreements. Little, if any, evidence was presented of any other "substantial assets" about which the Debtor allegedly made knowing and fraudulent false oaths or statements, although the Complaint references valuable antiques, bank account(s), tools and equipment, liquid cash, a vested retirement plan, and "sundry other personalty," as well as the vehicles. Transfers of assets of Livery, even if made to MRS without consideration, and even if made to hinder *Livery's* creditors during *its* bankruptcy, have no relevance to the Debtor's case. Thus, based upon the foregoing, this court cannot find that the Debtor violated § 727(a)(4)(A).

In her Brief, the Plaintiff sets forth fifteen false oaths or accounts made by the Debtor, which she claims were violative of § 727(a)(4)(A). We shall list each of them ("P.") and indicate the specific reason why we conclude that each lacks merit ("R.").

(1) P.: The Debtor claimed on his Schedule A that the debt of another Theodore H. Henderson, Jr. living in Montgomery County was *his* debt. R.: The Plaintiff provided no evidence to prove this allegation. In any event, it is unclear why such a misstatement would be material.

(2) P.: The Debtor claimed on Schedules A–2 and A–3, that the Plaintiff's debt is an "unsecured claim without priority," when he promised her that she would be a "creditor holding security." R.: There is no proof of such a promise. Further, regardless of the existence of such a promise, there is no evidence that the Debtor owned property against which the Plaintiff could duly perfect a security interest;

(3) P.: The Debtor claimed that a debt owed to the business of one Joseph F. Petaccio listed on his Schedule A–3 was a debt of the Debtor when it was in fact a debt of Livery. R.: Petaccio's testimony (he was another of the parade of witnesses) and the Schedules and Statements indicate that this allegation is true. However, the immateriality of this "false oath" seems, like the first of the false oaths, to be incontrovertible. Such a statement does not concern discovery of assets, the existence or disposition of the Debtor's assets, and/or business transactions or past dealings relevant to this adversary proceeding.

(4) P.: The Debtor omitted listing the Realty, of which the Plaintiff avers that the Debtor owns either an equitable interest or a leasehold interest, on his Schedules. R.: The evidence does not indicate

that the Debtor "owns" the Realty, legally nor equitably, and the Plaintiff has not offered into evidence any document purporting to grant him an equitable interest. The Plaintiff failed to provide evidence indicating any leasehold interest of the Debtor in the property.

(5)—(6) P.: The Debtor omitted the bank account of MRS and as many as four motor vehicles owned by Livery from his Schedules. R.: This bank account and motor vehicles are property of MRS or Livery and not of the Debtor or his estate. Hence, they properly were not listed on the Debtor's Statements and Schedules.

(7) P.: The entire contents within the Realty, including a computer, are not listed on the Debtor's Schedules. R.: There is no evidence that the Debtor owned the personal property at the Realty. He testified that the Mother owned it.

(8) P.: The Debtor failed to list his future interest in the Realty. R.: There is no evidence that the Debtor has a future interest in the Realty.

(9) P.: The Debtor failed to list on his Schedule of Current Income his employment by Mundy's funeral home "at nearly $300 a week." R.: The Debtor did indeed omit this information from his Schedules, as corroborated by the testimony of Mundy, who indicated that the Debtor had been his employee since January 7, 1991. However, the rate of compensation alleged by the Plaintiff, unlikely to be an underestimate, is modest. We do not believe that this information is material, since it in no way aids in the discovery of the Debtor's assets, the existence or disposition of the Debtor's assets, and/or business transactions relevant to this adversary proceeding. This is a Chapter 7 case, and, unless the Debtor's income were sufficient to support invocation of 11 U.S.C. § 707(b), which neither the United States Trustee nor the Trustee (nor this court *sua sponte*) has shown any inclination to invoke, this disclosure is immaterial.

(10) P.: The Debtor failed to disclose that his income from the Church included a car allowance of $1,800 and "possibly" a cash draw. R.: Powell's testimony recited the Debtor's full compensation as priest at the Church. A car allowance of $1,800 *annually*, was indicated. Powell stated that the figures were normal for a similarly situated priest. They do not appear excessive to us. Moreover, the testimony of Rosen, Chesterman, and Powell indicate that the Church had dismissed the Debtor pre-petition, in October, 1990, and had provided for him only a partial monthly housing allowance of $1,000.00 thereafter until March, 1991, when all compensation ceased. The testimony adduced is consistent with the information provided on the Debtor's Schedules and Statements.

(11) P.: The Debtor failed to show his cash income from the operation of Livery and MRS. R.: Little in the way of tangible evidence was provided concerning the financial condition of Livery at the time of the Debtor's bankruptcy filing other than a bank statement dated February 28, 1991, which listed a balance of $62.96 and the Debtor's and Seifert's testimony that Livery continues to operate, but in a greatly reduced mode. As to income from MRS, the Debtor testified that the AIDS epidemic had "killed off" much of this business, and Whelans testified that the business no longer exists. Therefore, we find these omissions not to be material.

(12) P.: The Debtor failed to show his actual expenditures, as reflected on the Exhibits from the 2004 Exam. of July 12, 1991, on his Schedule of Current Expenditures. R.: Omission of the information included in this Exhibit does not qualify as a false oath regarding the *Debtor's* finances, since the information concerns primarily checks written on the Livery and MRS accounts and other financial information of the two corporate business entities, rather than that of the Debtor individually.

(13) P.: The Debtor failed to amend his Petition and/or Schedules to reflect that he is a debtor "engaged in business." R.: The Plaintiff did not present any evidence regarding this allegation. The Debtor, while probably incorrectly utilizing the Statement of Financial Affairs forms for an individual *not* engaged in business, did disclose his participation in Livery in the

Schedules. MRS was actually owned by Whelans and Whitehead during the time that it was in existence, as a corporate entity, and hence appears to have been properly excluded therefrom.

(14) P.: The Debtor failed to recite, in his Statement of Financial Affairs, that he is making a $1,000.00 per month payment on the Lincoln. R.: Pursuant to Smith's testimony, it appears that payments on the Lincoln came from Livery, not from the Debtor individually.

(15) P.: The Debtor failed to truthfully recite, in his Statement of Financial Affairs, that he paid at least $600 in attorneys' fees to Pitock from the MRS account, disclosing only payment of $500 to Pitock. R.: The payments to Pitock noted in the MRS account may well relate to services for Livery, not the Debtor individually. In any event, the discrepancy is so small as to clearly be immaterial.

Consequently, we conclude the Plaintiff has not proven, by a preponderance of the evidence, that the Debtor made any misstatements in his bankruptcy Statement or Schedules or elsewhere which rose to the level of a material, false oath. Many of the alleged misstatements arise from the Plaintiff's own apparent misunderstanding that an individual debtor and corporate entities in which he is involved are separate, and that the former need not disclose assets of the latter on his Schedules. In addition, the Plaintiff made absolutely no showing that the mostly trivial misstatements included therein were made either "knowingly" or "fraudulently." Therefore, we conclude that the Debtor's discharge cannot be denied on the basis of § 727(a)(4)(A).

### 4. *11 U.S.C. § 523(a)(2)(A)*

Finally, we address the Plaintiff's challenges to the dischargeability of the Debtor's obligations to her under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

■ In order for the Plaintiff to prevail in her claim based upon § 523(a)(2)(A), the Plaintiff was obliged to prove, by a preponderance of the evidence,

(1) that the debtor made the [mis]representation[s];

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor [relied] on such representations;

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made;

*In re Feldman*, 111 B.R. 481, 485 (Bankr. E.D.Pa.1990), citing *In re Cirineo*, 110 B.R. 754, 757, 758 (Bankr.E.D.Pa.1990); *In re Bergman*, 103 B.R. 660, 671 (Bankr. E.D.Pa.1989); and *In re Stelweck*, 86 B.R. 833, 846 (Bankr.E.D.Pa.1988), *aff'd sub nom. United States v. Stelweck*, 108 B.R. 488, 489 (E.D.Pa.1989).

■ As we already thoroughly discussed in our analysis of the Plaintiff's claims under § 727(a)(2), we fail to find that, given the Plaintiff's extensive involvement in the Debtor's affairs, she can now credibly aver that she relied on any representation made by the Debtor to her detriment. The Plaintiff was a significant participant in *every* transaction involving the Realty, and was the architect of many of them. We thus find that the Plaintiff cannot now come forward and veritably contend that the Debtor made a false representation regarding his equitable interest in the Realty upon which she relied to her detriment. The Plaintiff structured the Realty transactions to create whatever interests were created, and she has already attempted to take advantage of the powers of attorney which she herself drafted in order to confess judgment against the Realty.

In her Brief, the Plaintiff relied heavily upon *In re Dunston*, 117 B.R. 632, 639 (Bankr.D.Colo.1990), for the proposition that the Debtor deceived her by means of "false pretenses," which, she argued was alone sufficient to have this court declare the Debtor's obligations to her nondischargeable under § 523(a)(2)(A). Specifically, the Plaintiff argued that the Debtor, through conduct and statements, misrepre-

sented to the Plaintiff that he was the equitable owner of the Realty.

We find that *Dunston* is clearly factually distinguishable from the instant case and hence that its holding that false pretenses can be an independent basis for denial of discharge under § 523(a)(2)(A) is of no import to the adversary proceeding at bar. In *Dunston*, a bankruptcy court declared non-dischargeable several loan debts made by a debtor's mother to the debtor "to operate" several businesses. The debtor did not own or operate the businesses, but he told his mother that he had certain options to acquire ownership of them. 117 B.R. at 634. The debtor, through several discussions with his mother, nevertheless represented that he was, in effect, the owner and operator of the subject businesses and that he could and would make the Mother a "partner" in them. *Id.* at 634–35. Allegedly in reliance upon these representations, the mother initially advanced $25,000 and then, upon the debtor's promise that she would receive certain percentages of stock in the debtor's enterprises, advanced $35,000 more a week later. *Id.* at 635. She therefore loaned a total of $60,000.00 to the debtor. *Id.*

The mother ultimately sued the son in state court prior to bankruptcy and obtained a default judgment. *Id.* at 635–36. A year later the debtor filed for bankruptcy. The debtor failed to list the equitable interests and/or options in the subject businesses which he represented to his mother that he had on his Schedules. The debtor attempted to testify at trial that he had the authority to transfer ownership of the businesses to his mother, but the court disbelieved him. *Id.* at 638. While it held that the mother's initial $25,000 loan was advanced because of her attachment to her son, the Court held that the debtor had received the $35,000 from his mother under false pretenses and as a result of the false representations regarding his interests in the businesses. *Id.* at 639, 641. The court found that, as to the second, $35,000 advance, the debtor had misled his mother, to her detriment, to believe that he effectively owned the businesses and could transfer stock from these businesses to her in con-

sideration for the monies she had advances to him. On this basis, the bankruptcy court denied the debtor discharge of the $35,000 debt owed by the debtor to his mother. *Id.*

In the instant adversary proceeding, the rights and powers of the Debtor, with reference to the Realty, were well known to the Plaintiff. Unlike the debtor's mother in *Dunston*, who forwarded the final $35,000 loan found nondischargeable based solely upon her son's representations, the Plaintiff was inextricably involved in transactions involving the Debtor. We find that the Plaintiff's motivation for continuing to perform additional legal services for the Debtor and Livery, even when she was initially unpaid, was to generate additional fees which she believed would be paid. The Plaintiff may have been overconfident that she could unravel the Realty sale transaction to recover her fees by executing upon the Realty. However, we do not believe that representations by the Debtor added significantly to her confidence level. However, her knowledge of the Debtor's affairs was gleaned from her own knowledge of the Debtor's business transactions, not any misrepresentations of same on his part.

The Plaintiff provided services for the Debtor which included the drafting two powers of attorney that were instrumental in the various transfers of the Realty, which she attempted to use for her own benefit. Because the Plaintiff personally orchestrated the transactions involved in the Realty transfers and, hence, was fully cognizant of the legally underpinnings and the extent of the Debtor's "equitable" interest in the Realty, we are unwilling to find that the Debtor could have made false representations or engaged in a continuous course of conduct concerning his "equitable" interest therein which would have deceived the Plaintiff, or amounted to a non-disclosure of information. In addition, the Plaintiff has failed to prove that the Debtor made any representations which he *knew* to be false.

We discount the Plaintiff's allegation that the Debtor, in the Contract, in his individual capacity or in his capacity as a

principal of Livery, promised to forbear from any action to remove her "security interests" on the Realty. Such a promise was illusory at best, since the Debtor did not have legal ownership of the Realty and did not have the capacity to bind Jill, the legal owner, to such a promise. Although the Plaintiff attempted to include Jill as a party responsible for the debts of Livery in Fee Agreement II, Jill was not a signatory of Fee Agreement II. Therefore, Jill did not agree to forbear from any action to remove the Plaintiff's "lien" from the Realty.

Based upon the evidence before us that the Plaintiff has failed to carry her burden of proving, by a preponderance of the evidence, that any of the five components of an action under § 523(a)(2)(A) were present. She has not established that the Debtor made any misrepresentations to her regarding his interest in the Realty. She has certainly not proven that the Debtor knew that any misrepresentations made to her were false. There is no evidence that the Debtor considered himself capable of deceiving the attorney who represented him in the Realty transaction, and hence that he had the intent and purpose of deceiving her. The Plaintiff has certainly not proven that she relied on the Debtor's misrepresentations, if any, as opposed to relying on her own knowledge of the transactions in deciding whether to provide further services to the Debtor. The damages suffered by the Plaintiff resulted from the Debtor's unforeseen inability to pay her, not his representations to her regarding the Realty. Therefore, the Plaintiff's claim under § 523(a)(2)(A) must fail.

### 5. 11 U.S.C. § 523(a)(2)(B)

The Plaintiff also briefly asserted a claim that the Debtor's obligations to her should not be discharged on the basis of § 523(a)(2)(B). This claim seems to be based on the theory that, in the Contract, the Debtor made certain recitals regarding Livery's property rights the material falsity of which, according to the Plaintiff, "is yet to be determined" in state court. Specifically, this claim is based upon those provisions of the Contract which state that Livery "is in fact the equitable owner" of

the Realty and that it will not do anything to affect the Plaintiff's lien against the Realty.

As we stated in *In re Glen*, 115 B.R. 837, 841 (Bankr.E.D.Pa.1990), the plaintiff in a § 523(a)(2)(B) action bears the "heavy burden of proving all of the four elements" set forth expressly in §§ 523(a)(2)(B)(i), (ii), (iii), (iv). In *In re Martz*, 88 B.R. 663, 673 (Bankr.E.D.Pa.1988), we noted that the third requirement, reasonable reliance upon the debtor's false financial statement, has two components which the creditor must prove, *i.e.*, "that it actually relied upon the misstatement and that such reliance was reasonable."

The Plaintiff, as in the case of her claim under § 523(a)(2)(A), falls short on almost every requirement of § 523(a)(2)(B). The statement that Livery is the equitable owner of the Realty appears not only false, but is inconsistent with the Plaintiff's testimony and her arguments elsewhere that the Debtor individually is the equitable owner of this Realty.

Moreover, the statements made in the Contract are made regarding *Livery's* financial condition, not the Debtor's. The Plaintiff, not the Debtor, drafted the Contract. Therefore, he did not publish it: the Plaintiff herself did. Finally, there is no evidence that the Plaintiff actually relied upon any of the recitals in the Contract or that any such reliance would have been reasonable. The Plaintiff, as draftsperson of the Contract and the architect of the documents establishing ownership of the Realty and the entry of the liens against it, knew, if anything, better than the lay Debtor whether the recitals in the Contract were true. It would therefore be totally unrealistic to conclude that the Contract was a device used by the Debtor to deceive the Plaintiff into providing him additional services.

Consequently, we conclude that we can reject the Plaintiff's § 523(a)(2)(2)(B) claim almost out of hand. Our broad view of this case is similar to the perception which we ultimately had of *Woerner, supra, i.e.*, that it is an unseemly attempt by a debtor's former lawyer to overpower a former client and wrest the client's discharge or the dis-

chargeability of the legal bill from him as an apparent act of retribution. The instant proceeding is, moreover, more unseemly than *Woerner*, because it is the very transactions which the Plaintiff created by labors for which she seeks fees which she claims constitute the bulk of the Debtor's wrongdoings. With little thanks to Pitock, who provided at best minimal services to the Debtor in the face of the Plaintiff's onslaught of paper and orchestration of a trial which was oppressive to the numerous innocent witnesses and the court, as well as to the Debtor, we are readily prepared to deny all aspects of relief sought by the Plaintiff in this proceeding.

## E. CONCLUSION

An Order entering judgment for the Debtor and dismissing all of the Plaintiff's claim will be entered.